# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Amgen Manufacturing, Limited; Immunex Rhode Island Corporation; and Amgen USA Inc., | NO. 04-12626 MLW |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| vs. |  |
| The Trustees of Columbia University in the City of New York, a New York corporation, |  |
| Defendant. |  |

Plaintiffs, Amgen Manufacturing, Limited, Amgen USA Inc. and Immunex Rhode Island Corporation (collectively, "Plaintiffs" or "Amgen Affiliates") have properly alleged the existence of a case or controversy. As demonstrated below, Columbia's Motion to Dismiss for lack of declaratory judgment jurisdiction – which ignores controlling law and critical facts – lacks merit and should be denied.

Columbia's motion is the latest in a long series of tactics designed to manipulate proceedings in the U.S. Patent and Trademark Office ("PTO") and then in the courts, to delay the determination that the public is entitled to use any invention that was the subject of the Axel patents. Columbia's assertion that it does not intend to sue the Affiliates "right now" (Columbia Memo., p. 2) misses the mark; it is precisely because Columbia does not want to sue the

1

Affiliates "right now" but insists on the right to sue them *later* for things they are *doing* "right now" that the Affiliates need a declaration.

Last year, Columbia moved to stay the determination of the validity of the '275 patent because its claims may change in re-examination. Columbia rehashes that argument now, saying that it may not be necessary to litigate the '275 patent "as it now reads." Columbia Memo, p. 2. But this Court has already rejected Columbia's argument that it should defer judicial action because "the PTO proceedings might moot, limit or alter the issues presented to the Court" as "not persuasive." Order, Aug. 16, 2004, p. 5. As the Court then noted:

> A stay would significantly harm the plaintiffs. While any stay is in effect, the drug companies' potential damages will mount. The uncertainty over whether they owe Columbia royalties on their products might create difficulties in pricing those products. It may also cause the drug companies to delay introduction of new products or needlessly invest money in efforts to design around an invalid patent. Such efforts are likely to be extremely costly in a highly regulated industry such as the one in which the drug companies compete because changes in their product designs or manufacturing processes may require regulatory approval.
>
> Eliminating this uncertainty is the very reason that the plaintiffs brought these declaratory judgment actions. It is also the reason that Congress and the President created a declaratory judgment remedy.

Order, Aug. 16, 2004, pp. 8-9. Amgen's Affiliates face that same uncertainty.

Columbia never disputed that there was a case or controversy between it and Amgen Inc. and Immunex Corporation (collectively "Amgen") regarding the '275 patent until it filed its Covenant Not To Sue (the "Covenant"). The Covenant to Amgen, however, is made illusory as a practical matter – and Columbia would achieve the same effect as from the stay that the Court denied – by Columbia's failure to extend the Covenant to the Amgen Affiliates involved in the exact *same* accused activity. Unless the Court sees through Columbia's gambit, Columbia will have achieved exactly the result it sought by its stay motion – deferral of any decision on the

merits, while reserving its claim for damages as to current and ongoing activities of the Amgen group of companies.

Ultimately, Columbia rests its motion on its repeated but inaccurate denial that it has ever alleged "'that [Amgen's] activities are covered by one or more claims of the '275 patent'" (Columbia Memo., p. 8) and later again the denial that it has asserted "that Amgen's activities are covered by one or more claims of the '275 patent" *Id.* at p. 9 n.5.[1]  That assertion is untenable, given the allegations in Columbia's February 12, 2004 Answer and Counterclaims in the *Amgen* action that "Columbia admits that its license agreements with Amgen and Immunex obligate Amgen and Immunex to pay royalties *based upon, inter alia, the '275 patent*, and that Columbia has so advised Amgen and Immunex" (Columbia's Answer and Counterclaims, p. 3, ¶ 5 (emphasis added)),[2] and that "Amgen has breached . . . the License Agreement by, *inter alia*, failing to pay royalties on sales of licensed products." *Id.* at p. 23, ¶ 14.  The major dispute between Amgen and Columbia in the MDL proceeding has always concerned Columbia's claim that the '275 patent covers Amgen's activities – a claim that changed from a royalty claim to an infringement claim when Columbia then purported to terminate its license.  When Columbia told this Court on June 22, 2004, that it intended to sue for infringement, that could only have been a reference to the '275 patent.  Columbia's suggestion of convenience now, that it has never asserted that the '275 patent claims cover the activities of Amgen, lacks any credibility.

---

[1]    Columbia also argues that it never made any "assertion that Amgen's activities would infringe the '275 patent in the absence of a license" (Columbia Memo., p. 8) and again denies "any allegation that any activities of Amgen or Immunex are 'covered' by any patent at all, let alone the '275 patent." *Id.* at pp. 8-9.  *See also* Columbia's subjunctive hypothetical:  "even if Columbia had asserted that Amgen had a royalty obligation under the '275 patent." *Id.* at p. 7.

[2]    A copy of the Columbia Answer and Counterclaims is attached hereto as Exhibit A.  Under the License Agreement, Amgen would only be obligated to pay royalties based upon the claims of the '275 patent if Amgen's products were "covered by a claim" of that patent.  *See* Compl., Ex. D (License Agreement), Section 1(c)(i).

<u>STATEMENT OF FACTS</u>

I.    <u>Columbia obtained the '275 patent by delay and manipulation of the patent process</u>

Columbia secured four patents, the '216, '665, '017 and '275 patents (collectively, "the

Axel Patents") from the PTO, all based on the same patent application filed February 25, 1980.

Compl., ¶ 2.  The first Axel patent issued in 1983 (the '216 patent).  However, Columbia

continued to prosecute its application to obtain further patents on the same alleged invention.

Faced with a double patenting rejection on August 12, 1985, Columbia filed a terminal

disclaimer in order to get its second Axel patent (the '665 patent).  Faced with another double

patenting rejection on January 8, 1992, Columbia filed a terminal disclaimer in order to get its

third Axel patent (the '017 patent).  Thus, by 1993, Columbia had three Axel patents

(collectively, "the prior issued Axel patents") all of which would expire on August 16, 2000.

Columbia then tried a new set of tactics to delay and elude the oversight of the PTO

while trying to get yet another 17 year patent term on the same invention.  For example, as

detailed in the Complaint (¶¶ 64-69), when one examiner rejected Columbia's further application

in February, 1998 by reason of its duplication of the purported invention described in the '017

patent, Columbia cancelled the pertinent transformed cell claim, then maneuvered in other

directions for years, and when a new examiner was in place in 2001 it added claims like that

cancelled in 1998 but did not advise the new examiner about the 1998 rejection.  As to other

such tactics, *see generally* Complaint, ¶¶ 32-74.  By such manipulation of the system, and by

engaging in unreasonable and unexplained delay in its prosecution, Columbia managed to obtain

a fourth Axel patent (the '275 patent) in September, 2002.

II.    <u>Columbia engaged in demands based on the '275 patent, but has used tactics of
       evasion and delay to avoid the determination of its validity</u>

After the prior issued Axel patents expired on August 16, 2000, Columbia demanded that Amgen continue to pay royalties because Columbia had additional pending patent applications claiming priority to the 1980 patent application, one of which later matured into the '275 patent. *Id.* at ¶ 3. Amgen filed suit in June, 2003 to challenge this demand, and on March 9, 2004, Columbia abandoned its claim to be owed royalties based on pending patent applications. However, on that same date Columbia also purported to terminate the Amgen license,[3] and Columbia did not abandon its Answer and Counterclaims filed February 12, 2004, in which it asserted that Amgen owed royalties *based on the '275 patent* and accordingly claimed royalties from Amgen.

When Columbia was later faced with the prospect that the validity of the '275 patent would be determined in an adversarial judicial proceeding in this Court, Columbia tried another avoidance tactic: it announced that it would file a Reissue Application in the PTO regarding that patent, and moved to stay the court proceedings. The Court denied Columbia's motion to stay, and scheduled the double patenting issue for discovery and determination before the end of the year. Columbia never suggested that its assertions regarding the '275 patent did not raise a justiciable case or controversy between it and Amgen, and indeed the Court recognized the need of Amgen and the other plaintiffs to have a determination regarding the patents:

> While any stay is in effect, the drug company's potential damages will mount with uncertainty over whether they owe Columbia royalties on its products. It may create difficulty in pricing those products. It may cause the delay of introduction of new products or needlessly invest money in efforts to design around the invalid patent.

Hearing Transcript, June 22, 2004, at 40:18-24.

As a result of the denial of the stay, upcoming expert and fact witness discovery threatened to lay bare the manipulation Columbia had practiced on the PTO. And Columbia

---

[3]    Until Columbia purported to terminate the Amgen license, Plaintiffs were protected by it and had no reason to sue Columbia.

knew that it would need to disclose such evidence to the PTO in the reissue proceeding.  As its next avoidance tactic, on September 2, 2004, Columbia filed an "Emergency Motion" to dismiss, supported by a Covenant.  That Covenant was riddled with exceptions and limitations, designed to give a minimum of assurance to the plaintiffs while arguably supporting a dismissal (and thus further delay) of actions to establish the invalidity of the patent.

In ensuing hearing before the Court on October 6, and because Columbia's Covenant was inadequate to negate a case or controversy as to Amgen and other plaintiffs, Columbia extended the Covenant to be permanent.  This Court ruled on November 5, 2004, that the extended Covenant was satisfactory to support dismissal of the patent counts as to Amgen.  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d 35 (D. Mass. 2004).

However, Columbia explicitly refused to extend the Covenant to Amgen's Affiliates – the Plaintiffs herein – on the ground that they were not parties to the action and thus no issue was before the Court as to them.  Because these Plaintiffs are actually and regularly engaged in the exact conduct that Columbia told Amgen was covered by the '275 patent claims, they present the same case or controversy that existed as to Amgen before Columbia granted its Covenant.  Any value of the Covenant for Amgen's operations is undermined *completely* by Columbia's failure to extend the Covenant to members of the Amgen group that participate in the accused activities.  Accordingly, in this action Plaintiffs seek a judicial declaration that the '275 patent is invalid, unenforceable and/or is not being infringed by Plaintiffs, and that Columbia's purported termination of Plaintiffs' license rights was invalid.

III.    Columbia's actions demonstrate its intent to enforce the '275 patent against

Plaintiffs, though at a time and in a court of Columbia's choosing

As alleged at paragraph 75 of the Complaint, Columbia has engaged in a lengthy and

sustained course of conduct demonstrating its intention to enforce the '275 patent against

Plaintiffs.[4]

Columbia has demanded that Amgen pay royalties under the License Agreement because

of the '275 patent, both in correspondence leading to Amgen's action (*see* Compl., ¶ 75(e))[5] and,

more formally, by alleging in its Answer and Counterclaims that "Columbia admits that its

license agreements with Amgen and Immunex obligate Amgen and Immunex to pay royalties

*based upon, inter alia, the '275 patent*, and that Columbia has so advised Amgen and Immunex."

Columbia's Answer and Counterclaims, p. 3, ¶ 5 (emphasis added).  In the same filing,

Columbia alleged accordingly that "Amgen has breached . . . the License Agreement by, *inter*

*alia*, failing to pay royalties on sales of licensed products." *Id.* at p. 23, ¶ 14.  When Amgen did

not pay, Columbia then purported to terminate the license agreement between Columbia and

Amgen, thus purporting to terminate Plaintiffs' rights as affiliates of Amgen and converting the

---

[4]    Columbia licensed the Axel patents to Amgen "and its Affiliates."  Compl., Ex. D, § 2(a).
Accordingly, when Columbia purported to terminate the License Agreement with Amgen, it
also purported to terminate Plaintiffs' license rights as Amgen Affiliates. *Id.* at ¶ 72(g).

[5]    Columbia's outside counsel's letter of November 12, 2002 to Immunex (copy attached as
Exhibit B), for example, had two enclosures (a copy of the '275 patent, and a copy of a case
where Columbia had sued to enforce an expired Axel patent), and adverted to being "forced to
consider alternative approaches to addressing the failure of Immunex to comply with its
obligations" – a thinly veiled threat of litigation.  Although Columbia's motion complains that
Amgen's Complaint referencing this language is "hopelessly vague," and that Columbia's
threat letter did not specify what "alternative approaches" it might have meant (Columbia
Memo., p. 8), courts are smart enough to understand the innuendo. *See, e.g., Glaxo Wellcome,
Inc. v. Pharmadyne Corp.*, 32 F. Supp. 2d 265, 272 (D. Md. 1998) (motion for summary
judgment denied where patentee had publicly stated its policy to use patent infringement

accusation of breach to an accusation of infringement.  The essence of a license agreement is a

promise not to sue.  There was no purpose to termination of this License Agreement except to

clear a path to sue for infringement.

Columbia then announced its *intention* to sue for infringement.  At the hearing on June

22, 2004, Columbia's counsel stated:

> Here's what I mean.  If the case were simply to go forward without staging, we
> would likely be filing infringement counterclaims.  They would have their validity
> defenses.

Hearing Transcript, June 22, 2004, p. 54.  And again:

> . . . we have counterclaims that we would like to assert, both breach of contract, which
> will live no matter what, and infringement, but won't be done now, but I think we should
> at least –
>
> THE COURT:  Why?
>
> MR. GINDLER:  Because I think that it's only fair to just close the pleadings and
> to put our claims on the table, and the infringement claims could be terminated if we lose
> on double patenting.

*Id.* at 194-95.[6]  (At the Court's suggestion, Columbia agreed that it could wait until January 2005

to plead its infringement counterclaims.  *Id.* at 196-97.)[7]

To circumvent this Court's denial of a stay, Columbia granted a Covenant to Amgen but

not to the Affiliates *for their participation in the same activity* – thus helping itself to the stay the

---

litigation against generic competitors, and had made "statements – pregnant with ominousness
– that it had no basis for determining whether Pharmadyne was infringing the '431 patent.")

[6]    This echoed Columbia's comments at the MDL hearing:  "[W]ill there be claims by
Columbia back against the biotech companies for infringement or for breach of contract?  And
the answer is, probably."  Hearing Transcript, March 23, 2004, p. 4, attached hereto as Exhibit
C.

[7]    Columbia further errs now in arguing that "an infringement action . . ., unlike a suit to
enforce a contractual royalty obligation, . . . puts the validity of the patent in question."
Columbia Memo., pp. 7-8 n. 4.  The invalidity of the '275 patent constituted a defense to
Columbia's royalty claims.  *See Lear, Inc. v. Adkins*, 395 U.S. 653, 673-74 (1969).

Court had denied, while preserving its right to recover from the Amgen group of companies for the same conduct.

ARGUMENT

I.      Plaintiffs have a reasonable apprehension that they will be sued for infringement of the '275 patent

The Federal Circuit has adopted a two-part test to determine whether a case or controversy exists that will sustain a declaratory judgment action in a patent case:

> First, the defendant's conduct must have created on the part of plaintiff a reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity. Second, the plaintiff must actually have either produced the device or have prepared to produce the device.

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988) (quoting *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 955 (Fed. Cir. 1987). The second of these requirements is present here, as Plaintiffs allege (Compl., ¶¶ 11-13) and as Columbia concedes in its motion. Columbia Memo., p. 4. Columbia's motion depends on its assertion that the requisite "reasonable apprehension" is not present.

Reasonable apprehension of an infringement suit exists under either of two circumstances – both of which are present here. First, a reasonable apprehension exists if a patentee threatens to bring suit or charges that the activity of a plaintiff is an infringement. *See Arrowhead Industrial Water, Inc.*, 846 F.2d at 736 ("If defendant has expressly charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more."). Second, even in the absence of an express charge regarding infringing activity, "reasonable apprehension" can be shown by less direct conduct of the patentee. *See Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1255 (Fed. Cir. 2002) ("Although the best evidence of a reasonable apprehension of suit comes in the form

of an express threat of litigation, an express threat is not required"); *Goodyear Tire & Rubber Co.*, 824 F.2d at 956 ("[W]e cannot read the Declaratory Judgment Act so narrowly as to require that a party actually be confronted with an *express* threat of litigation to meet the requirements of an actual case or controversy" (emphasis in original)).  Rather, if the patentee has not threatened to bring an infringement suit or charged infringement, the court must consider the totality of the circumstances to determine if a reasonable apprehension of suit exists.  *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed. Cir. 1992) (holding that, in the absence of a charge of infringement "we must look . . . to the totality of the circumstances" (internal quotation omitted)).

A.     Columbia has expressly charged that the *activity* of Plaintiffs is covered by the '275 patent

Columbia notes that this Court has observed that "Columbia has not, however, implicitly or explicitly threatened to sue *those entities* [the Affiliates]."  *In re Columbia Univ. Patent Litig.*, 343 F. Supp. 2d at 42 (emphasis added)).  But that is not the same thing as saying that Columbia has not accused *the activity* of the Plaintiffs.  Columbia expressly asserted that Amgen's *activity* is covered by one or more claims of the '275 patent, and has purported to terminate Amgen's license and then announced its intention to counterclaim for infringement.  This amounts to an accusation that these *activities* (in which the Amgen Affiliates are also engaged) are infringing the '275 patent.

Plaintiffs' apprehension that Columbia will bring suit against them for infringing the '275 patent is based on Columbia's previous litigation against Amgen regarding the *exact same activity*.  Litigation with third parties regarding the same technology may give rise to a person's reasonable apprehension of suit.  In *Teva Pharmaceuticals USA, Inc. v. Abbott Laboratories*, 301

F. Supp. 2d 819 (N.D. Ill. 2004), Abbott had filed in Canada a challenge to Teva's Canadian

affiliate's marketing of generic BLAXIN; this, combined with Abbott's history of litigating

against Teva in the U.S. as to some other drugs, was held to establish Teva's reasonable

apprehension that Abbott would file a U.S. suit against Teva regarding BLAXIN.  Lawsuits

against *suppliers*, or *unrelated* manufacturers of *similar* products, may form a basis for

apprehension of a suit against the declaratory plaintiff.  *See C.R. Bard, Inc. v. Schwartz*, 716 F.2d

874, 881 n.6 (Fed. Cir. 1983) (citing *Medtronic, Inc. v. American Optical Corp.*, 327 F.Supp.

1327, 1333 (D. Minn. 1971) (holding that "[i]n view of these statements, *and in view of the*

*defendant's practice of threatening suit and actually bringing suit against alleged infringers of*

*the related '990 patent,* the plaintiff could reasonably fear that the defendant would eventually

sue it for infringement of the '428 patent.") (emphasis added)); *Zenith Labs., Inc. v. Bristol-*

*Myers Squibb Co.*, 1991 WL 267892, at *5 (D. N.J. 1991) (suit by patentee against plaintiff's

intended supplier of new product, plus past litigation of same patent against a different product

of plaintiff's, sufficed for a reasonable apprehension of suit against the new product).

Columbia's recital of the fact that it did not communicate directly *with Plaintiffs* (Columbia

Memo., pp. 1, 5) overlooks the legal principle that "a reasonable apprehension may be found in

the absence of *any* communication from defendant to plaintiff."  *Arrowhead Industrial Water,*

*Inc.*, 846 F.2d at 736 (emphasis in original); *see also FIGI Graphics, Inc. v. Estate of Edwards*,

1997 WL 567792, at *3 (D. Kan. 1997) (same).  In addition, it simply begs credibility to assert

that communications to Amgen would not also be communications to Amgen's affiliates, the

Plaintiffs here.

B.     The "totality of the circumstances" also show that Plaintiffs have a reasonable apprehension that Columbia will sue them, though at a time and place of its choosing

Commencing in September of 2002, Columbia engaged in a consistent course of conduct demonstrating its intent to enforce the '275 patent against licensed parties, including Amgen. Compl., ¶ 72.  Courts recognize that "the fact that [the patentee] has already initiated suit against a company that engages in activities very similar to those of [the plaintiff] is relevant" to the case or controversy issue (*Ion Beam Applications, S.A. v. The Titan Corp.*, 156 F. Supp. 2d 552, 557 (E.D. Va. 2000)), and here the conduct of Amgen and of Plaintiffs is the *same* activity.  *See also Cable/Home Communications Corp. v. Oak Industries, Inc.*, 1986 U.S. Dist. LEXIS 16544, at *3-4 (E.D. Pa. 1986) (case or controversy present where patentee had brought suit against seven others in industry, including the former corporate parent of the plaintiff which had conducted "the very business operation now conducted" by the plaintiff).

Columbia *never* contested that Amgen had a reasonable apprehension of suit in its case against Columbia until Columbia filed its Covenant, and indeed Columbia itself counterclaimed for declaratory relief and stated its intention in Court to counterclaim for infringement.  In this case, Plaintiffs stand in the same position that Amgen occupied before that Covenant was issued. Columbia has not only refused to extend its Covenant to cover Plaintiffs, but also specifically amended the original version of the Covenant to clarify that it *excludes* affiliates such as Plaintiffs.[8]  Moreover, in the final version of the Covenant, Columbia "categorically reject[ed]"

---

[8]     *Compare* Exhibit D attached hereto, Columbia's Covenant Not to Sue Plaintiffs for Infringement of the '275 Patent as It Presently Reads for Products Made, Used or Sold On or Before the Date of This Covenant (not discussing application to affiliates) *with* Exhibit E attached hereto, Columbia University's Amended and Restated Covenant Not to Sue Plaintiffs

any claim that the '275 patent is invalid, unenforceable or not being infringed by Amgen or its affiliates. Am. Covenant at 2. Taken together, these actions indicate Columbia's intent to enforce the '275 patent against any potential infringer, including Plaintiffs, but at a time and in a court of its choosing.

Even in less closely connected disputes than those in the MDL proceeding and here, the refusal of the patentee to give a covenant not to sue is a relevant factor to the plaintiff's reasonable apprehension. In *Kos Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, 242 F. Supp. 2d 311 (S.D.N.Y. 2003), the court held that a previous suit by defendant against plaintiff on *different patents*, a press release showing general intention of defendant to enforce patent rights, and the refusal of defendant to give a covenant not to sue, were sufficient circumstances to establish a reasonable apprehension. In the case at bar, there was a previous suit by defendant against Plaintiff's affiliates claiming coverage of their activity under the *same* patent, extensive efforts by defendant to enforce the *same* patent rights, and an explicit refusal in open court to extend the covenant to these Plaintiffs.[9]

---

for Infringement of the '275 Patent ("Am. Covenant"), at 2 ("this covenant does not extend to any affiliate or customer of any plaintiff").

[9]    As recognized even in one of Columbia's cited cases, "a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination" of reasonable apprehension. *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993). This case is unlike the situations in other cases cited by Columbia.

In *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 889 (Fed. Cir. 1992), the potential infringer was the one who approached the patentee and tried to provoke a dispute by eliciting "responses, characterizations and arguments" from discussions it initiated. *See also International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1213 (7th Cir. 1980) (patentee not required to respond to request for clearance); *CAE Screenplates, Inc. v. Beloit Corp.*, 957 F. Supp. 784, 790 (E.D. Va. 1997) (same). Columbia started this dispute by claiming that the Amgen activities were covered by its patent, demanding royalties, then purportedly terminating the license and threatening infringement counterclaims. In that context, its refusal to extend the Covenant to Amgen affiliates loudly proclaims its eventual intentions.

Similarly, Columbia's reliance on *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 2003 WL 22888848 (D. Mass. 2003) is misplaced, where the patentee had not accused or taken actions

Columbia asserts that Plaintiffs have a "burden of proving that they have an objectively reasonable apprehension that Columbia is poised to bring an infringement suit." Columbia Memo., p. 14. That is not the law, and Columbia is contradicted by its own cited authority, *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d at 1054 ("a reasonable apprehension of suit does *not* require that the patentee be known to be poised on the courthouse steps") (emphasis added).

Repeatedly, Columbia argues for dismissal because Plaintiffs do not have a reasonable apprehension that Columbia will bring suit *for now*: not "right now" (Columbia Memo., p. 2); not "now" (*id.* at p. 10); not "imminent" (*id.*); not "tomorrow or the next day" or "right now" (*id.* at p. 11); Columbia is not "poised to bring an infringement action" (*id.*). Columbia is mistaken in arguing that its lack of desire to sue *at this moment*, or *until* the PTO has ruled on the reissue application, negates a current controversy.

> When the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer is not required to wait for the patentee to decide when and where to sue, but can take the initiative and seek declaratory relief.

*EMC Corp. v. Norand Corp.*, 89 F.3d 807, 811 (Fed. Cir. 1996), cited by Columbia; *see also Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1255 (Fed. Cir. 2002) (holding that "a patentee's present intentions do not control whether a case or controversy exists"); *Medtronic, Inc. v. American Optical Corp.*, 327 F.Supp. at 1333 (reasonable "fear that the defendant would *eventually* sue") (emphasis added).

---

directed at the activity of the plaintiff. And in *Hewlett-Packard Co. v. Genrad, Inc.*, 882 F. Supp. 1141, 1156 (D. Mass. 1995) the patentee's oral threat of "dire consequences" was undercut by later written reassurances not to charge infringement as to existing products. Much more is present in this action than statements made in licensing negotiations or general comment about having a "strong proprietary position" as in *Cygnus Therapeutics Systems v. Alza Corp.*, 92 F.3d 1153 (Fed. Cir. 1996), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc*., 141 F.3d 1059 (Fed. Cir. 1998), on which Columbia relies.

The facts of *Vanguard Research* are analogous to this case. The patentee had previously sued the plaintiff on non-patent claims (e.g., trade secret claims), but made "'repeated statements that it does not intend to sue Vanguard for patent infringement.'" *Vanguard Research*, 304 F.3d at 1254. The district court granted the patentee's motion to dismiss after it "found no actual controversy based on 'PEAT's repeated statement that it does not intend to sue Vanguard for patent infringement and its ongoing failure to bring such a suit.'" *Id.* at 1255. The Federal Circuit reversed, noting that the filing of the earlier lawsuit, though not involving the patents, and informing PEAT's customers that it was not licensed, showed "'a willingness to protect the technology'" (quoting from *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987)), and holding that "the appropriate inquiry asks whether Vanguard had a reasonable apprehension that PEAT would sue it for patent infringement *in the future* . . . . Filing a lawsuit for patent infringement would be just another logical step in its quest to protect its technology." *Id.* at 1255 (emphasis added). *See also Goodyear Tire & Rubber Co.*, 824 F.2d at 956 (holding that patentee's president's statement that he had not authorized the bringing of an infringement suit was irrelevant in light of circumstances giving rise to a reasonable apprehension that the patentee would bring suit in the future); *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1484 (Fed. Cir. 1998) (case or controversy is not destroyed by statement of a change of mind by patentee "disavowing" previous statements, because Declaratory Judgment Act was intended to forestall "scare-and-run tactics"). The question is not whether Columbia intends to file suit against Plaintiffs "right now." Columbia has insistently reserved its rights to sue Plaintiffs in the future regarding products Plaintiffs are *now* distributing,[10] and therefore a case and controversy exists *now* between the parties.

---

[10]    Columbia's counsel were even quoted in the press, following this Court's November 5

II.    Columbia's alternative argument, that the Court should decline to exercise
jurisdiction even if there is a case or controversy, lacks merit

The Federal Circuit's recent decision in *Capo, Inc. v. Dioptics Medical Products, Inc.*,
387 F.3d 1352 (Fed. Cir. 2004), demonstrates that courts should not decline to exercise
jurisdiction over declaratory judgment actions merely because the patentee is not "right now"
prepared to sue.

In *Capo,* the district court found that an actual controversy existed between the parties
but declined to decide whether the plaintiff had a reasonable apprehension that the patentee
would bring an infringement suit, deciding instead to exercise its discretion to dismiss the case
because it was not "sufficiently crystallized." *Capo*, 387 F.3d at 1354. The Federal Circuit
reversed, holding that the district court had abused its discretion and emphasizing the strict limits
on courts' discretion to decline to exercise jurisdiction:

> There must be well-founded reasons for declining to entertain a declaratory judgment
> action. Absent such reasons, precedent establishes that when there has been no direct
> charge of infringement by the patentee, and an actual controversy exists due to ongoing
> activity that has been accused of infringement, the accused infringer has the right to
> resolve the dispute.

*Id.* at 1355. *See also id.*, at 1357 ("There must be a sound basis for refusing to adjudicate an
actual controversy, for the policy of the Act is to enable resolution of active disputes"). After
finding that the record demonstrated plaintiff's reasonable apprehension of suit (*id.* at 1356), the
Federal Circuit explained why dismissal would be inappropriate:

> The refusal to exercise jurisdiction leaves Capo helpless and immobile so long as the
> patent owner refuses to grasp the nettle and sue. In patent cases the court's refusal to
> accept a declaratory action also raises issues of public interest, for patent rights are of
> competitive impact as well as innovation incentive. The present dispute has immediacy
> and reality, the criteria of Article III. Resolution of this dispute is within the court's

ruling, to the effect that the "ruling leaves open the possibility of a future decision by the
government agency that would extend the school's rights after all." Boston *Globe*, *Judge
Halts Patent Suits Against Columbia* (Nov. 9, 2004), attached hereto as Exhibit F.

capability, and it is the district court's responsibility to resolve it. Declining to do so is an abuse of discretion.

*Id.* at 1358 (internal quotations and citations omitted).

Similarly, in *Minnesota Mining and Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672-73 (Fed. Cir. 1991), the court reversed dismissal of a declaratory judgment action where the patent was subject to an interference proceeding but the defendant was engaged in ongoing activity that might later be found to be infringement. The court found it to be an abuse of discretion not to hear the case in light of the potential harm to the plaintiff:

As 3M continues to sell products it believes do not infringe, its potential liability grows. These are among the problems the Declaratory Judgment Act sought to alleviate.

*Id.* at 673. The court rejected the defendant's argument – like that made by Columbia here – that the pendency of proceedings in the PTO, which might moot the dispute, permit the court to decline jurisdiction. On the contrary, the court ruled "3M is entitled by the Declaratory Judgment Act to have a decision on the infringement question and not to have to wait until the interference is finally resolved." *Id.* at 674.[11]

III.    Columbia's motion should in any event be denied as to Plaintiffs' Sixth Claim because a case or controversy exists regarding whether Columbia engaged in repressive practices under the License Agreement

Apart from Plaintiffs' reasonable apprehension that Columbia will sue them in the future for infringing the '275 patent, a case or controversy also exists regarding whether Columbia

---

[11]    The Federal Circuit has also recently stated that it is an abuse of discretion to dismiss a declaratory relief challenge to a patent even if the plaintiff has confidence that ultimately it will have no liability, because "there are other uncertainties, including whether there will be legal proceedings at all," and that threatened parties "are entitled to sue to bring an end to the threat, despite their confidence in their position." *Electronics for Imaging, Inc. v. Coyle*, --- F.3d ---, No. 04-1266 (Fed. Cir., Jan. 5, 2005), p. 8. The situation with regard to the issued '275 patent, which Columbia can later assert to claim damages because of current conduct of

violated the License Agreement by engaging in repressive practices. Columbia's motion entirely ignores that the Sixth Claim seeks a declaration of rights under the License Agreement – as do the Third and Fourth Causes of Action in Columbia's counterclaim against Amgen in the MDL proceeding – and thus does not depend on any threat by Columbia to sue for infringement.

Plaintiffs are express third party beneficiaries of the License Agreement (*see* Compl., Ex. D, §§ 1(a) and 2(a)), which incorporates by reference the same obligations imposed by the United States Government on Columbia pursuant to 35 U.S.C. §§ 200-211, regulations thereunder, and the determination letter to Columbia from the Department of Health and Human Services dated February 24, 1981. *See* Compl., ¶ 22, Ex. D at App. A. Among those obligations is an obligation imposed on Columbia by the determination letter and 45 C.F.R. § 8.2(b) to refrain from "unreasonable royalties and repressive practices," an obligation imposed on Columbia to avoid any unusual restrictions (45 C.F.R. § 8.0(c)), and an obligation imposed on Columbia to refrain from "unreasonable restrictions or excessive royalties" (45 C.F.R. § 8.1(b)) (collectively, the obligation to refrain from engaging in "repressive practices").

Columbia's entire pattern of conduct leading to and involving the Axel patents constituted repressive practices, including: improperly attempting to extend the terms of the Axel patents (Compl., at ¶¶ 25-28); delaying the prosecution leading to the '275 patent to obtain the '275 patent after the prior issued Axel patents had expired (*id.* at ¶¶ 29-31); making misrepresentations and misleading omissions that were material and non-cumulative to the examination and or patentability of the Axel patents and the '275 patents (*id.* at ¶¶ 32-74); and alleging that the Axel patent applications and the '275 patent cover Plaintiffs' activities (*id.* at ¶ 75). By engaging in these repressive practices, Columbia violated the License Agreement, and is

Plaintiffs, is entirely different from the situation cited by Columbia where no patent was yet in

accordingly barred from enforcing the '275 patent and/or terminating the License Agreement. *Id.* at ¶¶ 104-105.

Columbia never explains why subject matter jurisdiction is lacking as to this claim. Columbia's motion to dismiss the parallel claim by Amgen was denied on the merits by the transferor court in the *Amgen* action, and Columbia never contested subject matter jurisdiction.

<u>CONCLUSION</u>

For the reasons set forth above, Columbia's motion to dismiss should be denied.

Dated:  January 18, 2005.                    Respectfully submitted,

    /s/ Eileen M. Herlihy
Eileen M. Herlihy (BBO #231410)
Palmer & Dodge LLP
111 Huntington Avenue at Prudential Center
Boston, MA  02199-7613
Telephone:  (617) 239-0100
Facsimile:   (617) 227-4400

---

existence.  *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482 (Fed. Cir. 1996).

# EXHIBIT A

1  GIBSON, DUNN & CRUTCHER, LLP
   Wayne M. Barsky, SBN 116731
2  Kevin S. Rosen, SBN 133304
   DoHoang T. Duong, SBN 219127
3  2029 Century Park East, Suite 4000
   Los Angeles, California 90067-4276
4
   Telephone:  (310) 552-8500
5  Facsimile:  (310) 557-8741
6  Attorneys for Defendant and Counterclaimant,
   The Trustees Of Columbia University
7  In The City Of New York

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   WESTERN DIVISION

11

12  IMMUNEX CORPORATION, a                | Case No. CV 03-4349-MRP(CWx)
    Washington corporation, and AMGEN,    |
13  INC., a Delaware corporation,         | ANSWER OF COLUMBIA
                                          | UNIVERSITY TO SECOND
14              Plaintiffs,               | AMENDED COMPLAINT FOR
                                          | DECLARATORY AND INJUNCTIVE
15         vs.                            | RELIEF
16  THE TRUSTEES OF COLUMBIA              | COUNTERCLAIMS FOR BREACH
    UNIVERSITY IN THE CITY OF NEW         | OF CONTRACT AND
17  YORK, a New York corporation,         | DECLARATORY RELIEF
18              Defendant.                | DEMAND FOR JURY TRIAL
19  THE TRUSTEES OF COLUMBIA              |
    UNIVERSITY IN THE CITY OF NEW         |
20  YORK, a New York corporation,         |
21              Counterclaimant,          |
22         vs.                            |
23  IMMUNEX CORPORATION, a                |
    Washington corporation, and AMGEN,    |
24  INC., a Delaware corporation,         |
25              Counterdefendants.        |
26
27
28

## ANSWER TO SECOND AMENDED COMPLAINT

The Trustees of Columbia University in the City of New York ("Columbia"), by and through their counsel of record in this action, respond to the Second Amended Complaint For Declaratory And Injunctive Relief Re: Contract Rights, Invalidity, Unenforceability and Non-Infringement Of U.S. Patent No. 6,455,275 (the "Second Amended Complaint") filed by Plaintiffs Immunex Corporation ("Immunex") and Amgen, Inc. ("Amgen") (collectively, "Plaintiffs") as follows:

1.      Responding to paragraph 1 of the Second Amended Complaint, Columbia specifically denies each and every allegation therein.

2.      Responding to paragraph 2 of the Second Amended Complaint, Columbia admits that it is the assignee of four issued United States patents, each of which claims priority to the filing date of application Serial No. 06,124,513, filed on February 25, 1980 (the "'513 application"), now United States Patent No. 4,399,216 (the '216 patent"). Columbia admits that the '216 patent issued on August 16, 1983. Columbia admits that United States Patent No. 4,634,665 (the "'665 patent") was issued on January 6, 1987, and claims priority to the filing date of the '513 application. Columbia admits that United States Patent No. 5,179,017 (the "'017 patent") was issued on January 12, 1993, and claims priority to the filing date of the '513 application. Columbia admits that U.S. Patent No. 6,455,275 (the "'275 patent") issued on September 24, 2002, and claims priority to the filing date of the '513 application. Columbia admits that it is, and at all relevant times has been, the assignee of the '216, '665, '017, and '275 patents (collectively, the "Axel patents"). Columbia admits that the '216 patent expired on August 16, 2000, and that the '665 and '017 patents were issued subject to terminal disclaimers which caused them to expire on that same date. Columbia admits that Amgen and Immunex have paid Columbia, in the aggregate, in excess of $100 million in contractual fees and royalties, an amount that is miniscule in proportion to the billions of dollars received by Amgen and

2

1   Immunex in connection with the sale of products licensed under, and made possible

2   by, the Axel patents. Except as so expressly admitted, Columbia denies each and

3   every allegation of paragraph 2.

4       3.      Responding to paragraph 3 of the Second Amended Complaint, Columbia

5   admits it is the assignee of European Patent No. 045,809, and certain national patents

6   based thereon, as well as patents from Japan and Canada. Columbia admits that these

7   patents speak for themselves. Columbia further admits that it is the assignee of

8   Canadian Patent No. 1179953, and that this patent speaks for itself. Except as so

9   expressly admitted, Columbia denies each and every allegation of paragraph 3.

10      4.      Responding to paragraph 4 of the Second Amended Complaint, Columbia

11  admits that its communications with Amgen and Immunex speak for themselves.

12  Except as so expressly admitted, Columbia denies each and every allegation of

13  paragraph 4.

14      5.      Responding to paragraph 5 of the Second Amended Complaint, Columbia

15  incorporates by reference, as if fully set forth herein, its response to paragraph 2 of the

16  Second Amended Complaint, above. Columbia admits that its license agreements

17  with Amgen and Immunex obligate Amgen and Immunex to pay royalties based upon,

18  *inter alia,* the '275 patent, and that Columbia has so advised Amgen and Immunex.

19  Except as so specifically admitted herein, by incorporation or otherwise, Columbia

20  specifically denies each and every allegation of paragraph 5.

21      6.      Responding to paragraph 6 of the Second Amended Complaint, Columbia

22  lacks knowledge or information sufficient to form a belief as to the reasons why

23  Amgen and Immunex have failed to comply with their obligations under their

24  respective license agreements, and on that basis denies the first sentence of

25  paragraph 6. Columbia admits that Amgen and Immunex purport to request certain

26  relief from the Court in their Second Amended Complaint, and further admits that the

27  allegations of the Second Amended Complaint speak for themselves, but specifically

28                                          3

1  denies that either is entitled to any such relief. Except as so expressly admitted,

2  Columbia specifically denies each and every allegation of paragraph 6.

3      7.    Responding to paragraph 7 of the Second Amended Complaint, Columbia

4  states that the allegations of the Second Amended Complaint speak for themselves and

5  require no response from Columbia. The remainder of paragraph 7 contains assertions

6  of legal conclusions requiring no response from Columbia. To the extent that any

7  response to paragraph 7 is required, Columbia denies each and every allegation of

8  paragraph 7.

9      8.    Responding to paragraph 8 of the Second Amended Complaint, Columbia

10  states that paragraph 8 contains assertions of legal conclusions requiring no response

11  from Columbia. To the extent that any response to paragraph 8 is required, Columbia

12  denies each and every allegation of paragraph 8.

13      9.    Responding to paragraph 9 of the Second Amended Complaint, Columbia

14  admits that Amgen publicly announced its acquisition of Immunex on July 16, 2002.

15  Except as so expressly admitted, Columbia lacks sufficient knowledge or information

16  sufficient to form a belief as to: a) the current state of incorporation of Immunex

17  (except to the extent that, in a 1991 license agreement, Immunex characterized itself

18  as a Delaware corporation, and in the joint proxy statement issued by Amgen and

19  Immunex in July 2002 Immunex is described as a Washington corporation); b)

20  whether the research of Immunex has led to the development of successful products;

21  and c) the precise corporate relationship between Immunex and Amgen, and on that

22  basis denies the allegations of paragraph 9.

23      10.    Responding to paragraph 10 of the Second Amended Complaint,

24  Columbia admits that Amgen's 2002 Form 10-K filed with the Securities and

25  Exchange Commission identifies Amgen as a Delaware corporation with its principal

26  place of business in Thousand Oaks, California. Columbia admits that Amgen is a

27  biotechnology company. Columbia lacks sufficient knowledge or information to form

28                                4

1    a belief as to the truth of the allegations in the last sentence of paragraph 10, and on

2    that basis denies such allegations. Except as so expressly admitted, Columbia denies

3    the allegations of paragraph 10.

4        11.    Responding to paragraph 11 of the Second Amended Complaint,

5    Columbia admits that it is a non-profit corporation organized and existing under the

6    laws of the State of New York, and that its principal place of business is in New York,

7    New York. Except as so expressly admitted, Columbia denies each and every

8    allegation of paragraph 11.

9        12.    Responding to paragraph 12 of the Second Amended Complaint,

10    Columbia admits that it is the assignee of four issued United States patents, each of

11    which claims priority to the filing date of the '513 Application, filed on February 25,

12    1980. Columbia admits that the '513 application matured into the '216 patent, and that

13    the inventions disclosed in the '513 application were made during the course of work

14    under grants from the National Institutes of Health, Department of Health and Human

15    Services. Except as so expressly admitted, Columbia denies the allegations of

16    paragraph 12.

17        13.    Responding to the third sentence of paragraph 13 of the Second Amended

18    Complaint, Columbia admits that the content of Exhibit A speaks for itself. Columbia

19    admits the allegations of every other sentence in paragraph 13.

20        14.    Responding to paragraph 14 of the Second Amended Complaint,

21    Columbia admits that the '665 patent issued on January 6, 1987 and that its contents

22    speak for themselves. Columbia admits that the contents of Exhibit B speaks for

23    itself. Except as so expressly admitted, Columbia denies each and every allegation of

24    paragraph 14.

25        15.    Responding to paragraph 15 of the Second Amended Complaint,

26    Columbia admits that the '665 patent issued on January 6, 1987, that the term of the

27    '665 patent subsequent to August 16, 2000 was terminally disclaimed, and that

28                                        5

1  consequently the '665 patent expired on August 16, 2000. Columbia further admits

2  that the prosecution history of the '665 patent speaks for itself. Except as so expressly

3  admitted, Columbia denies each and every allegation of paragraph 15.

4      16.    Responding to paragraph 16 of the Second Amended Complaint,

5  Columbia admits the allegations of the first sentence of paragraph 16. Columbia

6  admits that the '017 patent issued on January 12, 1993. Columbia further admits that

7  the prosecution history of the '017 patent and the '017 patent speak for themselves.

8  Columbia admits that the content of Exhibit C speaks for itself. Except as so

9  expressly admitted, Columbia denies each and every allegation of paragraph 16.

10      17.    Responding to paragraph 17 of the Second Amended Complaint,

11  Columbia admits that its is the assignee of European Patent No. 045,809 and of

12  national patents based on the European Patent. Columbia further admits that these

13  patents speak for themselves. Columbia further admits that it is the assignee of

14  Canadian Patent No. 1,179,953 and that this patent speaks for itself. Except as so

15  expressly admitted herein, Columbia specifically denies each and every allegation of

16  paragraph 17.

17      18.    Responding to paragraph 18 of the Second Amended Complaint,

18  Columbia admits that it has earned contractual royalties and fees under the Axel

19  patents in excess of $100 million, and states that whatever royalties Columbia has

20  received are miniscule in proportion to the many billions of dollars of revenue

21  generated by the biotechnology industry in connection with the sale of the numerous

22  products licensed under, and made possible by, the Axel patents. Except as so

23  expressly admitted, Columbia specifically denies each and every allegation of

24  paragraph 18.

25      19.    Responding to paragraph 19 of the Second Amended Complaint,

26  Columbia admits the allegations of the first two sentences of paragraph 19. Columbia

27  states that the terms of the Amgen and Immunex licenses speak for themselves.

28                               6

Columbia admits that the contents of Exhibits E and F speak for themselves. Except as so expressly admitted, Columbia specifically denies each and every allegation of paragraph 19.

20.    Responding to paragraph 20 of the Second Amended Complaint, Columbia admits that the Amgen and Immunex licenses speak for themselves. Except as so expressly admitted, Columbia denies each and every allegation of paragraph 20.

21.    Responding to paragraph 21 of the Second Amended Complaint, Columbia admits that the Amgen and Immunex licenses speak for themselves. Columbia further admits the content of the February 24, 1981 letter from the Department of Health & Human Services to Columbia speaks for itself. Except as so expressly admitted, Columbia denies each and every allegation of paragraph 21.

22.    Responding to paragraph 22 of the Second Amended Complaint, Columbia specifically denies each and every allegation of paragraph 22.

23.    Responding to paragraph 23 of the Second Amended Complaint, Columbia admits that the Appropriations Act, Public Law 106-387, 106th Congress (2000), speaks for itself. Except as so expressly admitted, Columbia specifically denies each and every allegation of paragraph 23.

24.    Responding to paragraph 24 of the Second Amended Complaint, Columbia admits that all versions of the Department of Defense Appropriations Act of 2001, Public Law 106-259, 106th Congress (2000), speak for themselves. Except as so expressly admitted, Columbia specifically denies each and every allegation of paragraph 24.

25.    Responding to paragraph 25 of the Second Amended Complaint, Columbia admits that the '216, '665, and '017 patents expired on August 16, 2000. Except as so expressly admitted, Columbia denies each and every allegation of paragraph 25.

7

26. Responding to paragraph 26 of the Second Amended Complaint, Columbia specifically denies each and every allegation of paragraph 26.

27. Responding to paragraph 27 of the Second Amended Complaint, Columbia incorporates by reference its response to paragraph 2 of the Second Amended Complaint, as if fully set forth herein. Columbia further admits that the prosecution histories of all patent applications that claim priority to the '513 application speak for themselves. Except as so expressly admitted herein, by incorporation or otherwise, Columbia specifically denies each and every allegation of paragraph 27.

28. Responding to paragraph 28 of the Second Amended Complaint, Columbia admits the '275 patent issued on September 24, 2002 and is assigned to Columbia. Columbia further admits that the '275 patent speaks for itself. Columbia admits that it did not terminally disclaim any portion of the term of the '275 patent. Columbia further admits that the content of Exhibit D speaks for itself. Columbia incorporates by reference, as if fully set forth herein, its response to paragraphs 15 and 16 of the Second Amended Complaint. Except as so expressly admitted, either by incorporation or otherwise, Columbia specifically denies each and every allegation of paragraph 28.

29. Responding to paragraph 29 of the Second Amended Complaint, Columbia specifically denies each and every allegation of paragraph 29.

30. Responding to paragraph 30 of the Second Amended Complaint, Columbia admits that the prosecution history of the '216 and '275 patents speak for themselves. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 30.

31. Responding to paragraph 31 of the Second Amended Complaint, Columbia admits that the claims and the prosecution history of the '275 patent and the

8

1    '216 patent speak for themselves.  Except as so expressly admitted herein, Columbia

2    specifically denies each and every allegation of paragraph 31.

3        32.    Responding to paragraph 32 of the Second Amended Complaint,

4    Columbia admits that the claims and the prosecution history of the '275 patent and the

5    '216 patent speak for themselves.  Except as so expressly admitted herein, Columbia

6    specifically denies each and every allegation of paragraph 32.

7        33.    Responding to paragraph 33 of the Second Amended Complaint,

8    Columbia admits that its statements to Congress speak for themselves.  Except as so

9    expressly admitted herein, Columbia specifically denies each and every allegation of

10   paragraph 33.

11       34.    Responding to paragraph 34 of the Second Amended Complaint,

12   Columbia specifically denies each and every allegation of paragraph 34.

13       35.    Responding to paragraph 35 of the Second Amended Complaint,

14   Columbia specifically denies each and every allegation of paragraph 35.

15       36.    Responding to paragraph 36 of the Second Amended Complaint,

16   Columbia admits that its statements to Congress speak for themselves.  Columbia

17   further admits that the claims and the prosecution history of the '275 patent speak for

18   themselves.  Except as so expressly admitted herein, Columbia specifically denies

19   each and every allegation of paragraph 36.

20       37.    Responding to paragraph 37 of the Second Amended Complaint,

21   Columbia admits that its statements to Congress speak for themselves.  Columbia

22   further admits that the claims and the prosecution history of the '275 patent speak for

23   themselves.  Except as so expressly admitted herein, Columbia specifically denies

24   each and every allegation of paragraph 37.

25       38.    Responding to paragraph 38 of the Second Amended Complaint,

26   Columbia specifically denies each and every allegation of paragraph 38.

27

28

9

39.    Responding to paragraph 39 of the Second Amended Complaint, Columbia admits that the prosecution history of the '275 patent speaks for itself. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 39.

40.    Responding to paragraph 40 of the Second Amended Complaint, Columbia admits that the prosecution history of the '275 patent speaks for itself. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 40.

41.    Responding to paragraph 41 of the Second Amended Complaint, Columbia admits that the prosecution history of the '275 patent speaks for itself. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 41.

42.    Responding to paragraph 42 of the Second Amended Complaint, Columbia admits that the prosecution history of the '275 patent speaks for itself. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 42.

43.    Responding to paragraph 43 of the Second Amended Complaint, Columbia admits that the prosecution history of the '275 patent speaks for itself. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 43.

44.    Responding to paragraph 44 of the Second Amended Complaint, Columbia states that the prosecution history of the '275 patent speaks for itself. Except as so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 44.

45.    Responding to paragraph 45 of the Second Amended Complaint, Columbia admits that the prosecution history of U.S. application Serial No. 08/477,159 (the "'159 application") speaks for itself. Except as so expressly

10

1   admitted herein, Columbia specifically denies each and every allegation of paragraph
2   45.

3       46.    Responding to paragraph 46 of the Second Amended Complaint,
4   Columbia admits that the prosecution history of the '159 application speaks for itself.
5   Except as so expressly admitted herein, Columbia specifically denies each and every
6   allegation of paragraph 46.

7       47.    Responding to paragraph 47 of the Second Amended Complaint,
8   Columbia admits that the prosecution histories of the '275 patent and the '159
9   application speak for themselves.  Except as so expressly admitted herein, Columbia
10  specifically denies each and every allegation of paragraph 47.

11      48.    Responding to paragraph 48 of the Second Amended Complaint,
12  Columbia admits that the prosecution histories of the '275 patent and the '159
13  application speak for themselves.  Except as so expressly admitted herein, Columbia
14  specifically denies each and every allegation of paragraph 48.

15      49.    Responding to paragraph 49 of the Second Amended Complaint,
16  Columbia admits that the prosecution history of the '159 application and '275 patent
17  speak for themselves.  Except as so expressly admitted herein, Columbia specifically
18  denies each and every allegation of paragraph 49.

19      50.    Responding to paragraph 50 of the Second Amended Complaint,
20  Columbia admits that the prosecution history of the '275 patent speaks for itself.
21  Columbia further admits the contents of the publications referenced in paragraph 50
22  speak for themselves.  Except as so expressly admitted herein, Columbia specifically
23  denies each and every allegation of paragraph 50.

24      51.    Responding to paragraph 51 of the Second Amended Complaint,
25  Columbia admits that the prosecution history of the '665 patent speaks for itself.
26  Columbia further admits the content of the publication referenced in paragraph 51

27

28                                  11

1  speaks for itself. Except as so expressly admitted herein, Columbia specifically denies
2  each and every allegation of paragraph 51.

3       52.    Responding to paragraph 52 of the Second Amended Complaint,
4  Columbia admits that the prosecution history of the '665 patent speaks for itself.
5  Columbia further admits the content of the publications referenced in paragraph 52
6  speak for themselves. Except as so expressly admitted herein, Columbia specifically
7  denies each and every allegation of paragraph 52.

8       53.    Responding to paragraph 53 of the Second Amended Complaint,
9  Columbia admits that the prosecution histories of the '275 patent and '665 patent speak
10  for themselves. Except as so expressly admitted herein, Columbia specifically denies
11  each and every allegation of paragraph 53.

12       54.    Responding to paragraph 54 of the Second Amended Complaint,
13  Columbia admits that U.S. application Serial No. 249,454 (the "'454 application") was
14  filed on March 15, 1982. Columbia further admits that the '454 application speaks for
15  itself. Columbia further admits that U.S. Patent No. 5,149,636 (the "'636 patent")
16  claims priority to the '454 application. Columbia further admits that the '636 patent
17  issued on September 22, 1992. Columbia further admits that the '275 and '636 patents
18  speak for themselves. Except as so expressly admitted herein, Columbia specifically
19  denies each and every allegation of paragraph 54.

20       55.    Responding to paragraph 55 of the Second Amended Complaint,
21  Columbia admits that the prosecution histories of the '216 patent, '275 patent, the '454
22  application, and those applications that claim priority to the '454 application speak for
23  themselves. Except as so expressly admitted herein, Columbia specifically denies
24  each and every allegation of paragraph 55.

25       56.    Responding to paragraph 56 of the Second Amended Complaint,
26  Columbia admits that the prosecution history of the '454 application and those
27  applications that claim priority to the '454 application speak for themselves. Except as

28                                    12

so expressly admitted herein, Columbia specifically denies each and every allegation of paragraph 56.

57.    Responding to paragraph 57 of the Second Amended Complaint, Columbia specifically denies each and every allegation of paragraph 57.

58.    Responding to paragraph 58 of the Second Amended Complaint, Columbia admits that the content of the correspondence referenced in paragraph 58 speak for themselves. Except as so expressly admitted, Columbia denies each and every allegation of paragraph 58.

59.    Responding to paragraph 59 of the Second Amended Complaint, Columbia incorporates by reference its responses to paragraph 1-58, inclusive, as if fully set forth herein.

60.    Responding to paragraph 60 of the Second Amended Complaint, Columbia admits that it contends that Amgen and Immunex are in breach of their respective license agreements with Columbia. Except as so expressly admitted, and to the extent any response to paragraph 60 is required, Columbia denies each and every allegation of paragraph 60.

61.    Responding to paragraph 61 of the Second Amended Complaint, Columbia admits that its communications with Immunex speak for themselves. Columbia further admits that the contents of the Second Amended Complaint speaks for itself. Except as so expressly admitted, Columbia specifically denies each and every allegation of paragraph 61.

62.    Responding to paragraph 62 of the Second Amended Complaint, Columbia admits that its communications with Amgen speak for themselves. Columbia further admits that the contents of the Second Amended Complaint speaks for itself. Except as so expressly admitted, Columbia specifically denies each and every allegation of paragraph 62.

13

63. Responding to paragraph 63 of the Second Amended Complaint, Columbia states that no response to this paragraph is required. To the extent any response is required, Columbia specifically denies the allegations set forth therein.

64. Responding to paragraph 64 of the Second Amended Complaint, Columbia incorporates by reference its responses to paragraph 1-63, inclusive, as if fully set forth herein.

65. Responding to paragraph 65 of the Second Amended Complaint, Columbia admits that it contends that Amgen and Immunex are in breach of their respective license agreements with Columbia. Except as so expressly admitted, and to the extent any response to paragraph 65 is required, Columbia denies each and every allegation of paragraph 65.

66. Responding to paragraph 66 of the Second Amended Complaint, Columbia admits that Plaintiffs owe royalty payments to Columbia based on the '275 patent. Columbia lacks knowledge or information sufficient to form a belief as to the reasons for Plaintiffs' contentions in this matter, and on that basis denies the second sentence of paragraph 66. Except as so expressly admitted, Columbia specifically denies each and every allegation of paragraph 66.

67. Responding to paragraph 67 of the Second Amended Complaint, Columbia lacks knowledge and information sufficient to form a belief as to the relief sought by Plaintiffs in this action and denies that Plaintiffs are entitled to such relief, and on those bases denies the allegations of the first clause of the first sentence of paragraph 67. Columbia specifically denies each and every other allegation of paragraph 67.

68. Responding to paragraph 68 of the Second Amended Complaint, Columbia lacks knowledge and information sufficient to form a belief as to the relief sought by Plaintiffs in this action and denies that Plaintiffs are entitled to such relief, and on those bases denies the allegations in the first clause of the first sentence of

14

1   paragraph 68.  Columbia specifically denies each and every other allegation of

2   paragraph 68.

3       69.    Responding to paragraph 69 of the Second Amended Complaint,

4   Columbia states that no response to this paragraph is required.  To the extent any

5   response is required, Columbia specifically denies the allegations set forth therein.

6       70.    Responding to paragraph 70 of the Second Amended Complaint,

7   Columbia incorporates by reference its responses to paragraph 1-69, inclusive, as if

8   fully set forth herein.

9       71.    Responding to paragraph 71 of the Second Amended Complaint,

10  Columbia specifically denies each and every allegation of paragraph 71.

11      72.    Responding to paragraph 72 of the Second Amended Complaint,

12  Columbia admits that the standards governing conduct before the Patent and

13  Trademark Office speak for themselves.  Except as so expressly admitted, Columbia

14  specifically denies each and every allegation of paragraph 72.

15      73.    Responding to paragraph 73 of the Second Amended Complaint,

16  Columbia specifically denies each and every allegation of paragraph 73.

17      74.    Responding to paragraph 74 of the Second Amended Complaint,

18  Columbia specifically denies each and every allegation of paragraph 74.

19      75.    Responding to paragraph 75 of the Second Amended Complaint,

20  Columbia states that no response to this paragraph is required.  To the extent any

21  response is required, Columbia specifically denies the allegations set forth therein.

22      76.    Responding to paragraph 76 of the Second Amended Complaint,

23  Columbia incorporates by reference its responses to paragraph 1-75, inclusive, as if

24  fully set forth herein.

25      77.    Responding to paragraph 77 of the Second Amended Complaint,

26  Columbia admits that the prosecution history of the applications that claim priority to

27

28                                          15

1    the '513 application speak for themselves.  Except as so expressly admitted, Columbia

2    specifically denies each and every allegation of paragraph 77.

3        78.    Responding to paragraph 78 of the Second Amended Complaint,

4    Columbia specifically denies each and every allegation of paragraph 78.

5        79.    Responding to paragraph 79 of the Second Amended Complaint,

6    Columbia specifically denies each and every allegation of paragraph 79.

7        80.    Responding to paragraph 80 of the Second Amended Complaint,

8    Columbia states that no response to this paragraph is required.  To the extent any

9    response is required, Columbia specifically denies the allegations set forth therein.

10        81.    Responding to paragraph 81 of the Second Amended Complaint,

11    Columbia incorporates by reference its responses to paragraph 1-80, inclusive, as if

12    fully set forth herein.

13        82.    Responding to paragraph 82 of the Second Amended Complaint,

14    Columbia specifically denies each and every allegation of paragraph 82.

15        83.    Responding to paragraph 83 of the Second Amended Complaint,

16    Columbia specifically denies each and every allegation of paragraph 83.

17        84.    Responding to paragraph 84 of the Second Amended Complaint,

18    Columbia states that no response to this paragraph is required.  To the extent any

19    response is required, Columbia specifically denies the allegations set forth therein.

20        85.    Responding to paragraph 85 of the Second Amended Complaint,

21    Columbia incorporates by reference its responses to paragraph 1-84, inclusive, as if

22    fully set forth herein.

23        86.    Responding to paragraph 86 of the Second Amended Complaint,

24    Columbia states that no response to this paragraph is required.  To the extent any

25    response is required, Columbia specifically denies the allegations set forth therein.

26

27

28

16

87.     Responding to paragraph 87 of the Second Amended Complaint, Columbia states that no response to this paragraph is required. To the extent any response is required, Columbia specifically denies the allegations set forth therein.

88.     Responding to paragraph 88 of the Second Amended Complaint, Columbia incorporates by reference its responses to paragraph 1-87, inclusive, as if fully set forth herein.

89.     Responding to paragraph 89 of the Second Amended Complaint, Columbia specifically denies each and every allegation of this paragraph.

90.     Responding to paragraph 90 of the Second Amended Complaint, Columbia specifically denies each and every allegation of paragraph 90.

91.     Responding to paragraph 91 of the Second Amended Complaint, Columbia admits that it contends that Amgen and Immunex are obligated to pay additional royalties under their respective license agreements with Columbia. Except as so expressly admitted, and to the extent any response to paragraph 91 is required, Columbia denies each and every allegation of paragraph 91.

92.     Responding to paragraph 92 of the Second Amended Complaint, Columbia states that no response to this paragraph is required. To the extent any response is required, Columbia specifically denies the allegations set forth therein.

93.     Responding to paragraph 93 of the Second Amended Complaint, Columbia states that no response to this paragraph is required. To the extent any response is required, Columbia specifically denies the allegations set forth therein.

94.     Responding to paragraph 94 of the Second Amended Complaint, Columbia incorporates by reference its responses to paragraph 1-93, inclusive, as if fully set forth herein.

95.     Responding to paragraph 95 of the Second Amended Complaint, Columbia states that no response to this paragraph is required. To the extent any response is required, Columbia specifically denies the allegations set forth therein.

17

96.    Responding to paragraph 96 of the Second Amended Complaint, Columbia states that no response to this paragraph is required.  To the extent any response is required, Columbia specifically denies the allegations set forth therein.

97.    Responding to paragraph 97 of the Second Amended Complaint, Columbia specifically denies each and every allegation of paragraph 97.

## AFFIRMATIVE DEFENSES TO THE SECOND AMENDED COMPLAINT

### FIRST AFFIRMATIVE DEFENSE

The Second Amended Complaint and each of its purported claims for relief fails to state a cause of action or claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The purported Third Claim for Relief fails to satisfy the requirements of Rule 9(b), Federal Rules of Civil Procedure.

### THIRD AFFIRMATIVE DEFENSE

Amgen and Immunex are in breach of their respective license agreements with Columbia, and are therefore not entitled to seek declaratory or other equitable relief with respect to their rights and obligations under such agreements by equitable principles of estoppel and unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

Amgen and Immunex are in material breach of their respective license agreements with Columbia, and are therefore not entitled to pursue their purported Seventh Claim for Relief to the extent it is predicated on Columbia's alleged failure to perform a condition of the parties' license agreements.

### FIFTH AFFIRMATIVE DEFENSE

This Court lacks personal jurisdiction over Columbia.

18

1

## SIXTH AFFIRMATIVE DEFENSE

2

Venue is improper in the Central District of California.

3

## SEVENTH AFFIRMATIVE DEFENSE

4

The Complaint and each of its purported claims are barred in whole or in part

5

by Plaintiffs' ratification of the action allegedly taken.

6

## EIGHTH AFFIRMATIVE DEFENSE

7

Plaintiffs come to this Court with unclean hands.  The Complaint and each of its

8

purported claims are barred in whole or in part by the doctrine of unclean hands.

9

## NINTH AFFIRMATIVE DEFENSE

10

Plaintiffs have engaged in conduct and/or made representations that estop them

11

from asserting in whole or in part each of its purported claims.

12

## TENTH AFFIRMATIVE DEFENSE

13

The Second Amended Complaint and each of its purported claims are barred in

14

whole or in part by the doctrine of waiver and/or acquiescence.

15

Dated:  February 12, 2004

16

GIBSON, DUNN & CRUTCHER LLP

17

18

By: _Kevin S. Rosen_

19

Kevin S. Rosen

20

Attorneys for Defendant and Counterclaimant,
The Trustees Of Columbia University
In The City Of New York

21

22

23

24

25

26

27

28

19

## DEMAND FOR JURY TRIAL

Columbia hereby demands a trial by jury on all claims and issues so triable.

Dated: February 12, 2004

GIBSON, DUNN & CRUTCHER LLP

By: _____
Kevin S. Rosen

Attorneys for Defendant and Counterclaimant,
The Trustees Of Columbia University
In The City Of New York

20

1

## **COUNTERCLAIMS**

2    The Trustees of Columbia University in the City of New York ("Columbia"), by

3  and through their counsel of record in this action, counterclaim against Amgen, Inc.

4  ("Amgen") and Immunex Corporation ("Immunex") as follows:

5

## **JURISDICTION**

6    1.    This is an action within the original jurisdiction of the federal courts

7  under 28 U.S.C. §1332(a)(1), in that counterclaimant Columbia is a citizen of the State

8  of New York, and counterclaim defendants Amgen and Immunex are alleged to be

9  citizens of the states of California and Washington, respectively. The amount in

10  controversy exceeds $75,000, exclusive of interests and costs. This Court also has

11  supplemental jurisdiction over this action pursuant to 28 U.S.C. §1367(a), in that the

12  claims presented herein form part of the same case or controversy as alleged in the

13  Second Amended Complaint. 28 U.S.C. §§ 1331, 1338(a), 2201.

14

## **VENUE**

15    2.    Venue is proper under 28 U.S.C. §1391(a)(1) in that Amgen and

16  Immunex are alleged to reside in this judicial district.

17

## **THE PARTIES**

18    3.    Counterclaim plaintiff Columbia is a research and educational institution

19  organized as a non-profit corporation under the laws of the State of New York, with

20  its principal place of business in New York, New York.

21    4.    On information and belief, counterclaim defendant Amgen is a Delaware

22  corporation with its principal place of business located in Thousand Oaks, California.

23    5.    On information and belief, counterclaim defendant Immunex is a

24  Washington corporation with its principal place of business located in Thousand

25  Oaks, California.

26

27

28

21

6.     On information and belief, Amgen acquired all of the outstanding stock of Immunex on July 15, 2002, and Immunex is now a wholly-owned Amgen subsidiary.

## BACKGROUND FACTS

7.     Columbia and Amgen are parties to a contract entitled "License Agreement relating to U.S. Patent No. 4,399,216 et al." and dated as of June 1, 1989 (the "Amgen License Agreement").

8.     In the Amgen License Agreement, Columbia granted Amgen a non-exclusive license under certain patents and patent applications specified therein. In return, Amgen agreed, *inter alia*, to pay Columbia a royalty on sales of certain licensed products. Amgen further agreed to pay Columbia an annual license fee.

9.     On or about August 16, 2000, Amgen ceased paying royalties to Columbia, notwithstanding Amgen's continued sale of royalty-bearing, licensed products. Amgen has also failed, since that time, to pay Columbia the required annual license fee.

10.     Columbia and Immunex are parties to a contract entitled "License Agreement relating to U.S. Patent No. 4,399,216 et al.," and dated October 1, 1991 (the "Immunex License Agreement").

11.     In the Immunex License Agreement, Columbia granted Immunex a non-exclusive license under certain patents and patent applications specified therein. In return, Immunex agreed, *inter alia*, to pay Columbia a royalty on sales of certain licensed products. Immunex further agreed to pay Columbia an annual license fee.

12.     In or about the first financial quarter of 2002, Immunex ceased paying monies due to Columbia under the license agreement, notwithstanding on information and belief Immunex's continued sale of royalty-bearing, licensed products.

22

## FIRST CAUSE OF ACTION

[Amgen's Breach of Contract]

13.    Columbia repeats, and incorporates by reference, the allegations set forth in paragraphs 1-12, inclusive, as if fully set forth herein.

14.    Amgen has breached and repudiated the Amgen License Agreement by, *inter alia,* failing to pay royalties on sales of licensed products, expressly repudiating its obligations under the Amgen License Agreement, and failing to pay the required annual license fee.

15.    Columbia has performed all of its obligations under the Amgen License Agreement.

16.    Amgen's breaches of the Amgen License Agreement have directly and proximately caused significant harm to Columbia, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

[Immunex's Breach of Contract]

17.    Columbia repeats, and incorporates by reference, the allegations set forth in paragraphs 1-16, inclusive, as if fully set forth herein.

18.    Immunex has breached and repudiated the Immunex License Agreement by, *inter alia,* failing to pay royalties on sales of licensed products, expressly repudiating its obligations under the Immunex License Agreement, and failing to pay the monies due thereunder.

19.    Columbia has performed all of its obligations under the Immunex License Agreement.

20.    Amgen's breaches of the Immunex License Agreement have directly and proximately caused significant harm to Columbia, in an amount to be proven at trial.

/ / /

/ / /

/ / /

23

1    **THIRD CAUSE OF ACTION**

2    [Declaratory Relief Against Amgen]

3        21.    Columbia repeats, and incorporates by reference, the allegations set forth

4    in paragraphs 1-20, inclusive, as if fully set forth herein.

5        22.    A substantial, continuing and justifiable controversy has arisen between

6    Columbia and Amgen regarding Amgen's royalty obligations under the Amgen

7    License Agreement.

8        23.    Amgen contends that it has no ongoing royalty payment obligations to

9    Columbia. Columbia disputes this position.

10       24.    A judicial declaration pertaining to Amgen's royalty payment obligations

11   under the Amgen License Agreement is necessary and would advance the interests of

12   justice.

13   **FOURTH CAUSE OF ACTION**

14   [Declaratory Relief Against Immunex]

15       25.    Columbia repeats, and incorporates by reference, the allegations set forth

16   in paragraphs 1-24, inclusive, as if fully set forth herein.

17       26.    A substantial, continuing and justifiable controversy has arisen between

18   Columbia and Immunex regarding Immunex's royalty obligations under the Immunex

19   License Agreement.

20       27.    Immunex contends that it has no ongoing royalty payment obligations to

21   Columbia. Columbia disputes this position.

22       28.    A judicial declaration pertaining to Immunex's royalty payment

23   obligations under the Immunex License Agreement is necessary and would advance

24   the interests of justice.

25   **PRAYER FOR RELIEF**

26       WHEREFORE, Columbia prays for relief against Amgen and Immunex as

27   follows:

28   24

---

A.    For a judgment against Amgen for breach of contract on the First Cause of Action and an award of compensatory damages in an amount to be proven at trial;

B.    For a judgment against Immunex for breach of contract on the Second Cause of Action and an award of compensatory damages in an amount to be proven at trial;

C.    For an award of pre-judgment interest on the First and Second Causes of Action;

D.    For a declaratory judgment against Amgen on the Third Cause of Action, including a judicial declaration of Amgen's royalty obligations under the Amgen License Agreement;

E.    For a declaratory judgment against Immunex on the Fourth Cause of Action, including a judicial declaration of Immunex's royalty obligations under the Immunex License Agreement;

F.    On all causes of action, for an award of attorney's fees and costs of suit; and,

G.    On all causes of action, for such additional relief as the Court deems just and appropriate.

Dated: February 12, 2004

GIBSON, DUNN & CRUTCHER LLP

By: _____
          Kevin S. Rosen

Attorneys for Defendant and Counterclaimant,
The Trustees Of Columbia University
In The City Of New York

25

ANSWER OF COLUMBIA UNIVERSITY TO SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF;
COUNTERCLAIMS FOR BREACH OF CONTRACT AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL

# DEMAND FOR JURY TRIAL

Columbia hereby demands a trial by jury on all claims and issues so triable.

Dated: February 12, 2004

GIBSON, DUNN & CRUTCHER LLP

By: _____
                Kevin S. Rosen

Attorneys for Defendant and Counterclaim
Plaintiff, The Trustees Of Columbia University
In The City Of New York

26

# DISCLOSURE STATEMENT

Columbia submits this Disclosure Statement pursuant to Rule 7.1(a), Federal Rules of Civil Procedure.  There is no parent corporation of Columbia, nor any publicly held corporation which owns more than 10% of Columbia's stock.

Dated:  February 12, 2004

GIBSON, DUNN & CRUTCHER LLP

By: _____
              Kevin S. Rosen

Attorneys for Defendant and Counterclaimant,
The Trustees Of Columbia University
In The City Of New York

20169277_1.DOC

27

# CERTIFICATE OF SERVICE

I, Norma Chavira, declare as follows:

I am employed in the County of Los Angeles, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 333 South Grand Avenue, Los Angeles, California 90071-3197, in said County and State. On February 12, 2004, I served the following document(s):

**ANSWER OF COLUMBIA UNIVERSITY TO SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; COUNTERCLAIMS FOR BREACH OF CONTRACT AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

on the parties stated below, by placing a true copy thereof in an envelope addressed as shown below by the following means of service:

| | |
|---|---|
| **Arthur Wineburg, Esq.** | **Kirke M. Hasson, Esq.** |
| Pillsbury Winthrop LLP | Pillsbury Winthrop LLP |
| 1133 Connecticut Avenue, N.W. | 50 Fremont Street |
| Washington, D.C. 20036 | Post Office Box 7880 |
| Tel: (202) 775-9800 | San Francisco, CA 94120-7880 |
| Fax: (202) 833-8491 | Tel: (415) 983-1000 |
| | Fax: (415) 983-1200 |

**Jennie L. La Prade, Esq.**
**Vicki G. Norton, Esq.**
Pillsbury Winthrop LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 629-1033

☑ **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE:** I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

☐ **BY FACSIMILE:** From facsimile number (213) 229-7520, I caused each such document to be transmitted by facsimile machine, to the parties and numbers indicated above, pursuant to Rule 2008. The facsimile machine I used complied with Rule 2003(3) and no error was reported by the machine. Pursuant to Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration.

☐ **BY UPS NEXT DAY AIR:** On the above-mentioned date, I placed a true copy of the above mentioned document(s) in a sealed envelope or package designated by the United Parcel Service with delivery fees paid or provided for, addressed to the person(s) as indicated above and deposited same in a box or other facility regularly maintained by United Parcel Service or delivered same to an authorized courier or driver authorized by United Parcel Service to receive documents.

☑ I am employed in the office of Kevin S. Rosen, a member of the bar of this court, and that the foregoing document(s) was(were) printed on recycled paper.

☐ **(STATE)**    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☑ **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2004.

_____
                    Norma Chavira

20169277_1.DOC

2

# EXHIBIT B

# COOPER & DUNHAM LLP

ATTORNEYS AT LAW

1185 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10036

TELEPHONE: (212) 278-0400

CHRISTOPHER C. DUNHAM
NORMAN H. ZIVIN
JOHN P. WHITE
WILLIAM E. PELTON
ROBERT D. KATZ
PETER J. PHILLIPS
WENDY E. MILLER
ROBERT T. MALDONADO
ERIC D. KIRSCH
ALAN J. MORRISON
GARY J. GERSHIK
MICHAEL F. MORANO
FRANK A. BRUNO
JASON S. MARIN
KEITH J. BARKAUS
HARVEY ABOOTO
ANTHONY V. FLINT*

IVAN S. KAVRUKOV
PETER D. MURRAY
JAY H. MAIOLI
ROBERT S.B. HOROWITZ
DONALD S. DOWDEN
DONNA A. TOBIN
RICHARD S. MILNER
RICHARD F. JAWORSKI
PAUL TENG
PEDRO C. FERNANDEZ
TODD W. EVANS
ALAN D. MILLER
CHRISTINE S. NICKLES
SPYROS S. LOUKAKOS*
MARIA V. MARUCCI
DEEPRO R. MUKERJEE

FACSIMILE: (212) 391-0525
(212) 391-0526
(212) 391-0630

OF COUNSEL
JOHN R. GARBER
MARK A. FARLEY

SCIENTIFIC ADVISORS
BRIAN J. AMOS, PH.D.
NICHOLAS F. MUTO, PH.D.
JOSEPH B. CRYSTAL, PH.D.
ARMAND L. BALBONI, M.PHIL.
MURIEL M. LIBERTO, PH.D.

FOUNDED 1887
www.cooperdunham.com

November 12, 2002

* NEW YORK STATE BAR ADMISSION PENDING

**BY FACSIMILE**
**CONFIRMATION BY CERTIFIED MAIL:**
**RETURN RECEIPT REQUESTED WITH ENCLOSURES**

Vasant Gandhi, J.D., Ph.D.
Senior Counsel
Immunex Corporation
51 University Street
Seattle, WA 98101-2936

> Re: October 1, 1991 Immunex/Columbia
> License Agreement Under Axel Patents
> Our File: 0575/20736

Dear Mr. Gandhi:

I have written to you on June 14 and August 6, 2002. You have not even given me the courtesy of a reply.

For your information and as notification to Immunex I enclose copies of the following:

1. U.S. Patent No. 6,455,275 B1 issued September 24, 2002, a Licensed Patent Right under which Immunex is licensed until Immunex's January 4, 2002 notice of termination becomes effective January 4, 2003;

2. a decision of the U.S. District Court for the District of Massachusetts upholding the validity and enforceability of certain of the Licensed Patent Rights.

Vasant Gandhi, J.D., Ph.D.
November 12, 2002
Page 2


Unless Immunex responds to our June 14 and August 6, 2002 letters
by November 18, 2002, Columbia will reluctantly be forced to
consider alternative approaches to addressing the failure of
Immunex to comply with its obligations under the License Agreement.

We look forward to hearing from you.

                              Sincerely,

                              John P. White

JPW/far
Enclosures

cc:  Elizabeth J. Keefer, Esq. (w/o enclosures - by facsimile)
     Susan L. Sgarlat, Esq. (w/o enclosures - by facsimile)
     Michael J. Cleare, Ph.D. (w/o enclosures - by facsimile)
     Scot G. Hamilton, Esq. (w/o enclosures - by facsimile)

# EXHIBIT C

1            UNITED STATES OF AMERICA

2     JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

3

4

5

6

7  MDL-1592        In re Columbia University Patent Litigation

8

9         (Excerpt of proceedings as to the above-entitled case

10  only)

11

12

13         Oral Argument on the above-described multidistrict

14  litigation case pursuant to 28 U.S.C. 1407, heard before the

15  Hon. Wm. Terrell Hodges, Chairman; John F. Keenan, Bruce M.

16  Selya, D. Lowell Jensen, J. Frederick Motz, Robert L.

17  Miller, Jr., and Kathryn H. Vratil, Judges of the Panel, at

18  9:59 a.m. on Tuesday, March 23, 2004, in Courtroom 13 A,

19  United States District Courthouse, 300 N. Hogan Street,

20  Jacksonville, Florida.

21

22

23  Reported by:

24         L. Marie Splane, CRR, RDR
           Official Court Reporter
25         P. O. Box 1196
           Jacksonville, Florida  32201-1196

```
 1 │ APPEARANCES:
   │
 2 │         DAVID I. GINDLER
   │         Irell & Manella LLP
 3 │         1800 Avenue of the Stars, Suite 900
   │         Los Angeles, California  90067-4276
 4 │                 appearing for The Trustees of Columbia
   │                 University
 5 │
   │         ARTHUR WINEBURG
 6 │         Pillsbury Winthrop LLP
   │         1133 Connecticut Avenue, N.W.
 7 │         Washington, DC  20036
   │                 appearing for Immunex Corp. and Amgen, Inc.
 8 │
   │         ADRIAN M. PRUETZ
 9 │         Quinn Emanuel Urquart Oliver & Hedges, LLP
   │         865 South Figueroa Street, 10th Floor
10 │         Los Angeles, California  90017-2543
   │                 appearing for Genentech
11 │
   │         DONALD R. WARE
12 │         Foley Hoag LLP
   │         155 Seaport Boulevard
13 │         Boston, Massachusetts  02210-2600
   │                 appearing for Baxter Healthcare Corporation,
14 │                 Biogen IDEC MA Inc., and Genzyme Corp.
   │
15 │
   │
16 │
   │
17 │
   │
18 │
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

1    March 23, 2004    P R O C E E D I N G S    9:59 a.m.

2    THE COURT: The next case on the docket is

3    MDL-1592, a new docket which we've denominated the Columbia

4    University Patent Litigation.  At the moment we are aware of

5    seven actions pending in different districts in which the          09:59

6    defendant in each case has moved for centralization under

7    Section 1407.  And the first to be heard in support of that

8    motion, I believe, is Mr. Gindler.

9    JUDGE JENSEN:  And I would be recused in this

10   case.                                                              10:00

11   THE COURT:  All right.  Judges Selya and Jensen

12   are recused.

13   MR. GINDLER:  Good morning, Your Honors.  My name

14   is David Gindler.  I represent Columbia University.

15   You mentioned that there were seven cases pending,          10:00

16   and that was true when we filed our motion for

17   centralization.  There are now eight cases pending.  There

18   was seven involving 11 biotech companies.  Now there are

19   eight, involving 12.

20   The last case involves a company called Serrano,          10:00

21   which has alleged the same bases for invalidating Columbia's

22   patent as all the other cases.  The principal bases are

23   double patenting, prosecution of laches, and inequitable

24   conduct.  There are some additional allegations in that case

25   shared by some, but not all of the other cases.  But the          10:01

1  test, of course, is common questions, not identical
2  questions.
3        There have been a couple of things which have
4  happened since the papers have been filed.  Just recently,
5  Columbia sent termination notices to many of the licensees.
6        Now, this raises an issue that some of the
7  licensees, the plaintiffs, raised in their papers, which is,
8  will there be claims by Columbia back against the biotech
9  companies for infringement or for breach of contract?  And
10  the answer is, probably.  Again, some of them.  We've
11  already asserted claims against three of them, I believe,
12  and there probably will be more coming.  So the question is,
13  does that make a difference?  And I think the answer is no.
14        Does it make a difference for a couple of reasons?
15  The first reason is, all those claims are going to require
16  claim construction.  An infringement case will require a
17  Markman hearing.  Just as well, all of the claims by the
18  plaintiffs against Columbia, those will all require a
19  Markman hearing.  And so that will be the central event in
20  all of the cases, the claim construction hearing.  So it
21  makes no difference.
22        And, in fact, the vast majority of the cases, the
23  published cases on multidistrict litigation involving
24  patents involve infringement cases, not invalidity cases
25  where courts have held if you have many cases which are

10:01

10:01

10:01

10:02

10:02

10:02

1    pending, involving one patent asserted against many parties,    10:02

2    they should be done together.

3        Well, here we have many biotech companies trying

4    to invalidate a patent which is owned by Columbia, and

5    Columbia may have counterclaims.  And those should all be    10:02

6    done together.

7        There has been another development since the

8    filing of the papers, and that is the lack of cooperation

9    among the plaintiffs.  I know that one factor the court

10   considers is:  Can we deal with this issue simply by    10:03

11   encouraging informal coordination?  Well, as the court may

12   have seen, no one has offered to coordinate discovery or

13   anything across all of the cases.

14       And since the filing of the papers, two things

15   have happened.  One is that Serrano, the most recent case to    10:03

16   be filed, wanted to serve some discovery.  And they called

17   me up and said, We want to serve some documents requests.  I

18   responded by saying, well, we have an MDL motion pending,

19   why don't you wait?  They said, We'd rather not.  And they

20   served the document requests, and we objected.    10:03

21       A second thing that's happened is that the

22   plaintiffs in the Amgen case tried to barrel forward with

23   discovery in their action.  The clerk sent out an order

24   setting a trial date and a discovery cutoff date, and Amgen

25   responded by saying, Great, let's have discovery.  And    10:04

10:04

1  Columbia responded by saying, Well, we have an MDL hearing

2  which is coming up, why don't we just wait and see what

3  happens.  And Amgen said no.

4          And there was a hearing held yesterday before

10:04

5  Judge Pfaelzer, who said, Why don't we wait and see what the

6  Panel does before doing anything.  We can always adjust our

7  schedule.

8          Recently, I think in the past couple of days, one

9  of the plaintiffs raised a question about jurisdiction in

10:04

10  the action in San Francisco, the action found by Genentech.

11  There is a recent case from the Federal Circuit called

12  GenProbe, and that decision holds that if a licensee is paid

13  under his license, still has his license, hasn't been

14  terminated, that licensee doesn't have standing to sue to

10:05

15  invalidate the patent.  Genentech is a licensee.  They say

16  they have been paying, and they are still suing to

17  invalidate the patent.

18          We did serve Genentech with a termination notice

19  because we don't agree that they are paying the proper

10:05

20  amounts under the agreement.  They haven't permitted us to

21  conduct an audit, and so I don't think there's a GenProbe

22  issue there.

23          There also is quite a lot of authority for the

24  proposition that a case that has a jurisdictional challenge

10:05

25  pending can still be transferred.  There's also case law for

1    the proposition that you can still transfer a case to the                10:05

2    district where a jurisdictional challenge has been set.

3         As we've said in our papers, we think the best

4    court for centralization is the Northern District of

5    California.  I think one of our principal reasons for that       10:05

6    is the Northern District has a very comprehensive set of

7    patent local rules which govern how patent cases proceed.  I

8    see that as --

9         JUDGE MOTZ:  But those rules can be incorporated

10   into a pretrial order by another court.  That happens all       10:06

11   the time.

12        MR. GINDLER:  That could, and that would be fine,

13   except I expect there to be a lot of jockeying among the

14   parties here to try to create a case schedule that best

15   benefits them.  By having a set of rules that are in place      10:06

16   as the governing rules, subject to possible modification, I

17   think is a better starting place than no rules, with each

18   party jockeying for a better procedural posture.

19        There's a lot of possibility for that here.  We

20   have 12 biotech companies.  We have Columbia University.        10:06

21   There's a lot of money at stake, and everyone will be trying

22   to push the envelope to the maximum position.  I think

23   having a set of rules in place that has a level playing

24   field, that's been tested over time, is a smart place to        10:06

25   start.  Thank you.

| | | |
|---|---|---|
| 1 | THE COURT:  Thank you, Mr. Gindler. | 10:07 |
| 2 | You do have a minute reserved for rebuttal. | |
| 3 | MR. GINDLER:  Thank you. | |
| 4 | THE COURT:  Next to be heard in opposition to the | |
| 5 | motion for centralization as I understand it is | 10:07 |
| 6 | Mr. Wineburg. | |
| 7 | MR. WINEBURG:  Thank you, Mr. Chairman.  I speak | |
| 8 | in opposition to the motion. | |
| 9 | Judge Pfaelzer, presiding in the Amgen case in the | |
| 10 | Central District, is prepared to hear this case this year. | 10:07 |
| 11 | She's entered a scheduling order that had trial on | |
| 12 | December 7th.  Upon request of Columbia last Friday, she | |
| 13 | held a telephonic conference yesterday in which she stayed | |
| 14 | discovery pending the decision of this Panel.  But she | |
| 15 | promised to modify the schedule only by the time it takes | 10:07 |
| 16 | this Panel to decide. | |
| 17 | So Judge Pfaelzer is prepared to have trial in the | |
| 18 | Amgen case this year.  And we submit that that serves the | |
| 19 | purpose of justice, convenience and efficiency. | |
| 20 | With respect to justice, we have at risk many | 10:08 |
| 21 | millions of dollars.  There's a cloud of uncertainty | |
| 22 | overlooking Amgen, and we filed a declaratory judgment | |
| 23 | action that would resolve that cloud and remove it.  And we | |
| 24 | believe we're entitled to the termination, and Judge | |
| 25 | Pfaelzer is prepared to give it to us.  So the only old | 10:08 |

9

1  saying I think applies:   Justice delayed, may be justice                10:08

2  denied.

3        With respect to convenience, Columbia talks about

4  some testimony will be given on multiple occasions, or will

5  be required if these cases aren't transferred.   I submit       10:08

6  that with respect to the key witnesses -- that's the

7  inventors, these are the people that are earning 20 percent

8  of all royalties paid -- that there will be multiple days of

9  deposition, regardless of whether there's transfer or not.

10 However, I submit that if these cases are not transferred,      10:09

11 the second and third depositions will supplement the first

12 and will not retrace the old questions.

13        In fact, what Columbia really wanted was a 1404

14 motion to avoid multiple trials.   They admitted that 1407

15 wouldn't really solve their problem.   And I submit that        10:09

16 they've elected to go 1407 as the second-best solution when

17 Judge Pfaelzer denied the 1404 motion, because it provides

18 them with delay, not -- they're not interested in expediting

19 the case, they're interested in delay.

20        So with respect to the judicial efficiency, I            10:10

21 submit that let Amgen have its early trial.   If Amgen wins,

22 all the cases go away.   And in any event, the Amgen case

23 will be tried before any Markman hearing would be held.   And

24 so I would suggest that the other parties and the judges

25 presiding over those cases could at that point decide          10:10

1    whether to stay Markman and some other proceedings in those

2    cases, pending resolution of the Amgen case on appeal.

3           THE COURT:  Mr. Wineburg, your time has expired,

4    and I think we do understand your position.

5           MR. WINEBURG:  Thank you, Your Honor.

6           THE COURT:  Next to be heard is Ms. Pruetz,

7    representing the plaintiff opposing centralization.

8           MS. PRUETZ:  Good morning, Your Honors.  Adrian

9    Pruetz for the plaintiff, Genentech.

10          Consolidating the cases of these competitors is

11   only going to delay their resolution because there are many

12   more issues that divide us than those that unite us in this

13   case.

14          Genentech, in particular, filed suit a year ago in

15   its home forum, the Northern District of California.

16   Genentech's suit was very narrowly focused on the double

17   patenting issues, prosecution laches, and certain elements

18   of inequitable conduct, to get this case to trial

19   immediately. And that was about to happen when this MDL

20   proceeding was commenced by Columbia University.  There was

21   already a scheduling order in place, because of the Northern

22   District local rules, that would have had a claim

23   construction hearing being held next week, on March 29th.

24   That was derailed by the filing of this motion, in which

25   everything has been stayed pending the outcome.

10:10

10:10

10:11

10:11

10:11

10:11

1    It would not be efficient, convenient or just for    10:12

2  Genentech, or really any of these parties to be consolidated

3  into the kind of unwieldy case that is resulting from the

4  posture that Columbia has taken.

5    As Mr. Gindler pointed out to the Panel, Columbia    10:12

6  has now served termination notices on all of the plaintiffs.

7  There are going to be a multiplicity of infringement claims,

8  and this is added to what already are unique distinctions

9  between the different cases dealing with the very different

10 terms of the parties' licenses.    10:12

11   There are more than 25 complicated and unrelated

12 biotechnology products, highly proprietary to each these

13 companies, which are competitors.  There will have to be --

14 I mean, every party would have to endure discovery and seek

15 multiple layers of protection in order to avoid disclosure    10:12

16 of their proprietary manufacturing processes.

17   If you look at the different claims in the cases,

18 even going beyond the very separate factual issues of

19 infringement, there are enormously different factual issues

20 asserted as bases for invalidity.  There are --    10:13

21   JUDGE MOTZ:  From the point of view, to the extent

22 there are common issues, from the point of view of justice,

23 Columbia runs the risk, if they lose in any of these cases,

24 collateral estoppel, which then bars it, but its opponents

25 would be free to litigate.  Is that right?  Should that be    10:13

| | |
|---|---|
| 1 | permitted?  It seems like it's somewhat of a one-way street. | 10:13 |

 1  permitted?  It seems like it's somewhat of a one-way street.  10:13

 2         MS. PRUETZ:  Well, if the patent is invalidated,

 3  there won't be any further litigation.  And Mr. Wineburg is

 4  correct, that if Amgen gets to trial first and the patent is

 5  invalidated, that's the end of the line in all of the cases.  10:13

 6         I think Mr. Gindler made a point that the parties

 7  were not cooperating.  That's not the case.  Where it is

 8  efficient for the parties to hold a single deposition,

 9  that's going to happen.  That's in everybody's best

10  interest.  10:13

11         To move along on the invalidation front, there

12  will be as much cooperation as there needs to be.  What

13  there can't be is cooperation on all of these multiple

14  issues unique to the parties because --

15         JUDGE MOTZ:  Excuse me, but you didn't answer my  10:14

16  question.  If the patient is invalidated, obviously it's

17  over for Columbia.  If the patent is invalidated, what

18  effect is that going to have in the other litigation?

19  Because the other parties are -- you know, are not barred by

20  collateral estoppel.  10:14

21         MS. PRUETZ:  That's correct, Your Honor.  If there

22  were additional bases alleged that hadn't been tried, and

23  perhaps even the ones that were alleged, there would be no

24  collateral estoppel for other plaintiffs to continue to

25  challenge the patent.  10:14

1          Now, if the matter is consolidated, which we          10:14

2   oppose, we believe also that the Northern District of

3   California is the most appropriate place.  It does have a

4   set of patent local rules in place, which have been lauded

5   by other courts as being extremely efficient, streamlining          10:14

6   the process.  Three times as many patent cases and

7   intellectual property cases are heard in the Northern

8   District of California as in Boston, Massachusetts, for

9   example.

10          THE COURT:  How many of these cases are presently          10:15

11   pending in that district, counsel, in the Northern District

12   of California?

13          MS. PRUETZ:  I don't have the exact figure for how

14   many cases exactly there are pending.

15          THE COURT:  There are at least two cases,          10:15

16   according to the information --

17          MS. PRUETZ:  Oh, in this case?  I thought you were

18   asking in general.  In this case, yes, there are two cases

19   pending.

20          THE COURT:  And they're presently assigned to          10:15

21   different judges?

22          MS. PRUETZ:  Yes, they are.  They were determined

23   to be unrelated.  Columbia moved to relate the cases and

24   have them assigned to a single judge, but because of the

25   numerous unique issues dealing with these different parties          10:15

1  and their products, the judge in the Northern District                    10:15

2  determined that they were not related.

3          THE COURT:  Which judge?

4          MS. PRUETZ:  Judge Walker.  And Judge Walker has

5  presided over some 120 patent cases.  He's written 21      10:15

6  published patent opinions.

7          If the case were to proceed in the Northern

8  District, I would submit to the Panel that it would be very

9  convenient for all the parties, wherever they're located,

10 because the Northern District also has mandatory e-filing,     10:15

11 such that any party, wherever they are, can electronically

12 file their papers and needn't have the cumbersome situation

13 of local counsel and having multiple layers of lawyers

14 getting involved and getting their filings.

15         And if the case were to go to the Northern         10:16

16 District and the stay would then be lifted and a very

17 streamlined and sequenced schedule would be set up for claim

18 construction and all of the other matters that have to be

19 dealt with.

20         THE COURT:  Your time has expired, Ms. Pruetz, and    10:16

21 I think we understand your position.

22         MS. PRUETZ:  Thank you, Your Honors.

23         THE COURT:  Next to be heard is Mr. Ware,

24 representing plaintiffs who also oppose centralization.

25         MR. WARE:  Thank you, Mr. Chairman.                   10:16

1    And the thrust of my presentation is to say that

2 although we oppose the MDL transfer, if there is a transfer,

3 the group that I represent, or that for whom I am speaking,

4 would urge that that transfer be to Massachusetts.

5    I'm speaking on behalf of eight plaintiffs who

6 have filed complaints in Massachusetts.  There are actually

7 four cases now pending in Massachusetts, including the

8 tag-along Serrano case that was referred to by Mr. Gindler.

9 All of them are assigned to Judge Wolf, and so I really have

10 two principal points that I'd like to make in support of

11 Massachusetts.

12    One is, simply, we think it makes no sense to drag

13 four cases and eight plaintiffs out of Massachusetts off to

14 the Northern District of California.  Out of the 13 parties

15 involved in this matter, there are only two, Columbia and

16 Genentech, who favor the Northern District of California.

17 And we simply do not understand.  We understand Genentech's

18 reasoning, and that's where they're based.

19    But Columbia, of course, is based in New York, and

20 it's a little bit unusual for a university to want to move

21 3,000 miles away for litigation.  Certainly not for the

22 convenience of the witnesses and parties, as Section 1407

23 requires.  Most of the parties are on the East Coast.  Most

24 of them actually are based in Massachusetts.  There is one

25 that is in Switzerland.  So this is a very East

10:16

10:17

10:17

10:17

10:17

10:17

10:18

1  Coast-centered matter.                                          10:18

2          The other point I wanted to make is that the -- we

3  think the most important efficiency factor -- and I think

4  all of the plaintiffs are very interested in efficiency here

5  and we want to get this case resolved -- we think the most    10:18

6  important efficiency factor in this case in this matter is

7  the familiarity of the court with the very complex

8  biotechnology that is involved.

9          Most of the lawyers, I can tell you in this case,

10 are not molecular biologists, and believe me, there is a      10:18

11 very steep learning curve to understand the

12 cotransformation, DNA -- recombinant DNA technology that is

13 involved in Columbia's patent.

14         Massachusetts presents a real opportunity in that

15 regard.  There are actually two judges in the country who     10:19

16 have published decisions about the cotransformation

17 technology and have both addressed the Columbia patents, and

18 they are both in Massachusetts.  One is Judge Wolf and one

19 is Judge Gertner.

20         Judge Wolf we discussed in our brief.  Judge Wolf      10:19

21 had an extensive published opinion which is in effect a

22 tutorial on this very technology, and he dealt with the

23 Columbia patent.

24         Judge Gertner -- we did not mention this in our

25 brief -- but Judge Gertner has also had a case where          10:19

1   Columbia actually choose to bring suit on its own patents,          10:19

2   on these patents that are involved in this case, in

3   Massachusetts against a third party called Roche

4   Diagnostics.   Judge Gertner has already construed claims in

5   the patents and is quite familiar with the technology.            10:19

6          So if Judge Wolf, who presently has the cases,

7   were not able to take an MDL for any reason, Judge Gertner

8   would equally be familiar with the technology.

9          So we think that in terms of bringing this to

10  closure efficiently, having a judge that doesn't have to go       10:20

11  through tutorials to learn about cotransformation

12  technology, gives us the best efficiency factor.   Thank you.

13          THE COURT:  All right.  Thank you.

14          Mr. Gindler, you have one minute remaining.

15          JUDGE KEENAN:  Mr. Gindler, does the fact that           10:20

16  Judge Walker, who is a very experienced judge, who has

17  handled an awful lot of multidistrict litigation matters,

18  said these cases are not related, and refused to take one as

19  related to the other, does that have any bearing on whether

20  or not the Panel should treat this as something that's           10:20

21  subject to 1407(3)?

22          MR. GINDLER:  I don't think so.  We don't know

23  anything about what Judge Walker's decision was based upon.

24  It's a form, it's if he checks off a box whether something

25  is related or not in the same district.  So it's simply a        10:20

18

1  black box to us.                                                    10:20

2          What we do know is that upon being told of the MDL

3  motion, Judge Walker stayed his case when Genentech tried to

4  barrel ahead with depositions of the inventors and said,

5  We're going to wait until we have an MDL ruling.  So I think     10:21

6  he recognizes that things have to pause to see what the

7  Panel in fact does.

8          I've heard a number of the plaintiffs argue

9  that --                                                              

10         JUDGE MOTZ:  My question to you is:  Why not             10:21

11 Massachusetts?

12         MR. GINDLER:  I think the answer to the question

13 is this:  Any one of the four districts in which the actions

14 are pending would be fine for centralization.  They each

15 have their benefits and their detriments in terms of            10:21

16 weighing where it should go.  There are benefits to

17 Massachusetts; there are benefits to New York.

18         The one benefit which I think the Northern

19 District has, which stands out, is the application of these

20 rules, the patent local rules at the starting point.  I see     10:21

21 that as extremely important in setting forth a level playing

22 field at the very beginning of this matter.  Otherwise, I'm

23 concerned that chaos will result.

24         We do not want delay.  Delay is not in our

25 interest.  We have a number of licensees who are not paying      10:22

1  on their license agreements.   It's much better for us to get      10:22

2  this matter resolved quickly because if our patent is upheld

3  to be valid, as we think it will be, we get paid again.   So

4  delay does not help us.   Thank you.

5          THE COURT:  All right.   Thank you all.  We will      10:22

6  take the matter under submission.

7          (Proceedings concluded at 10:22 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3  UNITED STATES DISTRICT COURT)

 4  MIDDLE DISTRICT OF FLORIDA

 5

 6        I hereby certify that the foregoing transcript is a

 7  true and correct computer-aided transcription of my

 8  stenotype notes taken at the time and place indicated

 9  therein.

10

11

12

13

14         _____ 5/4/2004
           L. MARIE SPLANE, Official Court Reporter,
15         United States District Court,
           Middle District of Florida.
16

17

18

19

20

21

22

23

24  Registered Diplomate Reporter (RDR)

25  Certified Realtime Reporter (CRR)
```

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE COLUMBIA UNIVERSITY
PATENT LITIGATION

MDL No. 1592 (MLW)

This Document Relates To All Actions

**COLUMBIA'S COVENANT NOT TO SUE PLAINTIFFS FOR INFRINGEMENT
OF THE '275 PATENT AS IT PRESENTLY READS FOR PRODUCTS MADE,
USED OR SOLD ON OR BEFORE THE DATE OF THIS COVENANT**

Dated: September 1, 2004

Thomas F. Maffei (BBO # 313220)
Scott McConchie (BBO # 634127)
Griesinger, Tighe & Maffei, LLP
176 Federal Street
Boston, MA 02210-2600
(617) 542-9900
(617) 542-0900 (fax)

Morgan Chu
David I. Gindler
Jason G. Sheasby
Irell & Manella LLP
1800 Ave of the Stars, Suite 900
Los Angeles, CA 90067-4276
(310) 277-1010
(310) 203-7199 (fax)

Wayne M. Barsky
Kevin S. Rosen
Amanda J. Tessar
Gibson, Dunn & Crutcher LLP
2029 Century Park East
Los Angeles, California
90067-3026
(310) 552-8500
(310) 551-8741 (fax)

ATTORNEYS FOR THE TRUSTEES
OF COLUMBIA UNIVERSITY IN
THE CITY OF NEW YORK

1172875

The Trustees of Columbia University in the City of New York ("Columbia") hereby covenants (1) not to assert any claim of patent infringement against Genentech, Inc., Biogen Idec MA Inc., Genzyme Corporation, Abbott Bioresearch Center, Inc., Wyeth, Genetics Institute LLC, Johnson & Johnson, Amgen Inc., and Immunex Corporation (collectively, "plaintiffs") under United States Patent No. 6,455,275 (the "'275 patent") as it presently reads, with respect to any product currently made, used, offered for sale, sold, or imported by plaintiffs, or any product that was made, used, offered for sale, sold, or imported by plaintiffs prior to the date of this covenant (collectively, "covered products"); and (2) not to assert the '275 patent as it presently reads against any plaintiff as a basis to recover royalties with respect to covered products under such plaintiff's license agreement with Columbia. This covenant is limited to the '275 patent as it presently reads and does not apply to any other patent, whether related or unrelated to the '275 patent. Specifically, this covenant does not apply to any reissued or reexamined version of the '275 patent that may issue in the future or to any patent that may issue from United States Patent Application No. 08/477,159.

In granting this covenant to plaintiffs, Columbia in no way concedes that the '275 patent is not infringed, invalid, or unenforceable. To the contrary, Columbia categorically rejects all such claims by plaintiffs.

This covenant eliminates any actual case or controversy between Columbia and any plaintiff concerning the '275 patent at this time. *See, e.g., Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852 (Fed Cir. 1999) ("Quadlux's promise not to assert any infringement claim against Amana under the patent as it presently reads, with respect to any product previously or currently advertised, manufactured, marketed, or sold by Amana, removed any reasonable apprehension that Amana will face an infringement suit based on its

activities before the filing date"); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995) ("Super Sack is forever estopped by its counsel's statement of non-liability, on its face and as explained during oral argument before this court, from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994. This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case."). Accordingly, Columbia respectfully submits that the Court no longer has subject matter jurisdiction over plaintiffs' claims relating to the '275 patent.

September 1, 2004

Respectfully submitted,

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK

By its attorneys,

 /s/ David I. Gindler_____
David I. Gindler
Irell & Manella LLP

 /s/ Wayne M. Barsky_____
Wayne M. Barsky
Gibson, Dunn & Crutcher LLP

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE COLUMBIA UNIVERSITY PATENT LITIGATION | MDL No. 1592 (MLW) |
| | This Document Relates To All Actions |

**COLUMBIA UNIVERSITY'S AMENDED AND RESTATED COVENANT NOT TO SUE PLAINTIFFS FOR INFRINGEMENT OF THE '275 PATENT**

Dated: October 12, 2004

Thomas F. Maffei (BBO # 313220)
Scott McConchie (BBO # 634127)
Griesinger, Tighe & Maffei, LLP
176 Federal Street
Boston, MA 02210-2600
(617) 542-9900
(617) 542-0900 (fax)

Morgan Chu
David I. Gindler
Jason G. Sheasby
Irell & Manella LLP
1800 Ave of the Stars, Suite 900
Los Angeles, CA 90067-4276
(310) 277-1010
(310) 203-7199 (fax)

Wayne M. Barsky
Kevin S. Rosen
Amanda J. Tessar
Gibson, Dunn & Crutcher LLP
2029 Century Park East
Los Angeles, California
90067-3026
(310) 552-8500
(310) 551-8741 (fax)

ATTORNEYS FOR THE TRUSTEES
OF COLUMBIA UNIVERSITY IN
THE CITY OF NEW YORK

1195864

Pursuant to the Court's Order of October 7, 2004, The Trustees of Columbia University in the City of New York ("Columbia") hereby amends and restates the Covenant Not to Sue filed on September 1, 2004 ("Original Covenant). The covenant set forth below supersedes the Original Covenant, as well as the clarifications of the Original Covenant set forth in the letters from Columbia's counsel dated September 10, 2004, and September 17, 2004. Upon reviewing the Original Covenant and the two letters referenced above, Columbia determined that it could prepare an amended and restated covenant that does not need to make reference to or incorporate any extrinsic materials.

Columbia, on behalf of itself and any successors-in-interest to United States Patent No. 6,455,275 (the "'275 patent"), hereby unconditionally and irrevocably covenants (1) not to assert any claim of patent infringement (including direct infringement, contributory infringement, and inducing infringement) against Genentech, Inc., Biogen Idec MA Inc., Genzyme Corporation, Abbott Bioresearch Center, Inc., Wyeth, Genetics Institute LLC, Johnson & Johnson, Amgen Inc., and Immunex Corporation (collectively, "plaintiffs") under the '275 patent as it currently reads; and (2) not to assert the '275 patent as it currently reads against any plaintiff as a basis to recover royalties under such plaintiff's license agreement with Columbia. This covenant covers any and all methods, processes, and products made, used, offered for sale, sold, or imported by any plaintiff at any time, whether before or after the date of this covenant. As used in this covenant, "products" broadly includes any DNA construct, any cotransformed cell, any cell line of contransformed cells, any cotransformed cell that has expressed any protein (whether or not such protein has sugar attached to it), any protein expressed by a cotransformed cell (whether or not such protein has sugar attached to it), and any other thing that would infringe any claim of the '275 patent

as it currently reads. This covenant covers all claims in the '275 patent as they currently read, and any claim in any reissued or reexamined version of the '275 patent that is the same as, or substantially identical to, any claim of the '275 patent as it currently reads. The term "substantially identical" as used herein is intended to have the same meaning as that term is used in 35 U.S.C. § 252.

This covenant does not extend to (1) any claim in any reissued or reexamined version of the '275 patent that is not the same as, or substantially identical to, any claim of the '275 patent as it currently reads; (2) any claim in any patent that may issue from United States Patent Application No. 08/477,159; or (3) any claim in any other patent, whether related or unrelated to the '275 patent. In addition, this covenant does not extend to any affiliate or customer of any plaintiff.

In granting this covenant to plaintiffs, Columbia in no way concedes plaintiffs' allegations that the '275 patent is invalid, unenforceable, or not infringed. To the contrary, Columbia categorically rejects all such claims by plaintiffs.

October 12, 2004                      Respectfully submitted,

                                      THE TRUSTEES OF COLUMBIA
                                      UNIVERSITY IN THE CITY OF NEW YORK

                                      By its attorneys,

                                       /s/ David I. Gindler_____
                                      David I. Gindler
                                      Irell & Manella LLP

                                       /s/ Wayne M. Barsky_____
                                      Wayne M. Barsky
                                      Gibson, Dunn & Crutcher LLP

# EXHIBIT F



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

*The Boston Globe*

## JUDGE HALTS PATENT SUITS AGAINST COLUMBIA

**Author(s):**   Ross Kerber Globe Staff **Date:** November 9, 2004 **Page:** D1 **Section:** Business

A federal judge in Boston dismissed patent claims filed by large biotechnology companies against Columbia University that alleged the New York school was improperly trying to extend its rights to a process widely used to engineer new drugs.

Columbia had collected several hundred million dollars over the years from its patents on the drug-making process. But the school recently pledged not to seek further royalties, so the judge in the case dismissed firms' claims. Nonetheless, the fight continues, and both sides claimed victory from the ruling, issued Nov. 5. The ongoing dispute is being closely watched as a test of the relationship between biotechnology firms and the academic scientists who have developed many of the industry's underlying techniques.

In the case, firms including Genzyme Corp. and Biogen Idec Inc., both of Cambridge, had accused the university of improperly trying to extend its rights to a process widely used to make proteins for drugs to treat diseases including cancer and arthritis.

At hearings this fall Columbia had agreed it wouldn't assert certain claims against the companies or try to recover royalty payments, according to the latest ruling by US District Judge Mark Wolf. As a result, Wolf granted Columbia's motion to dismiss the claims.

"Plaintiffs are not now incurring any potential liability to Columbia, and Columbia is not explicitly or implicitly threatening to sue any of them as a result of their current activities," he wrote.

Donald R. Ware, a Foley, Hoag attorney in Boston who represented Biogen Idec and Genzyme, said the result reflects the agreements by Columbia in October and secures a major victory for the companies. By agreeing it wouldn't press for damages, "Columbia has in effect abandoned the patent on which we sued," he said.

In dismissing the claims, Wolf let stand Columbia's patent itself, which the school is having reexamined by the US Patent and Trademark Office. David I. **Gindler**, an attorney at the firm of Irell & Manella LLP in Los Angeles who represents Columbia, said Wolf's ruling leaves open the possibility of a future decision by the government agency that would extend the school's rights after all.

"I think we're quite happy with that result," **Gindler** said. "We asked for that result, the plaintiff fought that result, and we're pleased that the court has granted our motion. So now the patent and trademark office can do its job and have no litigation before it."

At the center of the case are patents based on research from the 1970s by Columbia professor Richard Axel, who this year was co-winner of the Nobel Prize for Medicine. Axel and two colleagues created a way to splice bits of DNA into living cells to create human proteins, a basic technique used to produce many of today's best-selling biotechnology products such as Genzyme's Cerezyme for Gaucher disease and Biogen Idec's multiple-sclerosis drug Avonex.

The patents, the basis of license fees and royalty payments, have grown increasingly valuable as new biotechnology drugs reach market. Previous filings showed Biogen Idec paid the school $35 million, and Genzyme paid $25 million.

The patents expired in 2000, but in 2002 Columbia received a new patent derived from its previous patents with 17 more years of protection.

According to court filings, Columbia then told the companies that under the terms of their licensing agreements, it expected continuing royalties based on the new patent. But the companies which also included West Coast giants Amgen Inc. and Genentech Inc. said the patent was invalid.

They stopped paying and filed various suits against Columbia the next year. Columbia told the companies it was terminating the licenses, but its request to stay their litigation was denied in August 2004 pending the conclusion of the

most recent Patent and Trademark Office review. (Columbia has since told Biogen Idec, Genzyme, and two other companies their failure to pay royalties is not a breach of their licenses.)

In his ruling, Wolf ordered attorneys for both sides to file a joint report by Dec. 6 to identify which claims should remain following his ruling, and whether the two sides should seek a settlement.

Ross Kerber can be reached at kerber@globe.com.

Perform a new search

# CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss has been served by email on this 18th day of January, 2005.

*Renée A Coshin*
Renée A. Coshin

Thomas F. Maffei (BBO # 313220)
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, MA 02210-2600
tmaffei@gtmllp.com
Telephone:  (617) 542-9900
Facsimile:  (617) 542-0900

Wayne M. Barsky
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067-3026
wbarsky@gibsondunn.com
Telephone:  (310) 552-8500
Facsimile:  (310) 551-8741

Amanda Tessar
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4100
Denver, CO 80202
atessar@gibsondunn.com
Telephone:  (303) 298-5700
Facsimile:  (303) 296-5310

Attorneys for THE TRUSTEES OF
COLUMBIA UNIVERSITY IN THE CITY
OF NEW YORK, *a New York Corporation*